Herman JACKSON, Jr., Appellant,

v.

James B. GODWIN, etc., Appellee.

No. 25299.

United States Court of Appeals
Fifth Circuit.

July 23, 1968.

**530**

Michael Meltsner, New York City, Earl M. Johnson, Jacksonville, Fla., for appellant.

David U. Tumin, Asst. Atty. Gen., Tallahassee, Fla., for appellee.

Before TUTTLE and GOLDBERG, Circuit Judges and HOOPER, District Judge.

TUTTLE, Circuit Judge:

Petitioner Herman Jackson is a twenty-seven year-old Negro who has been a prisoner for over seven years at the Florida State Prison under sentence of death for the crime of rape. Petitioner is lodged in the prison's maximum security area, the East Unit, which has a population of, about 1,100 or one-third of the prison's population. Approximately one-half of the population of the East Unit and of the prison as a whole is Negro. Jackson resides in Death Row, in a cell block with some seventeen others similar-

ly condemned to death, all confined in single solitary cells. Each is not visible to the Death Row inmates but the cells are penetrable by voice. As a Death Row prisoner Jackson is not allowed visitors and the usual privileges afforded the other prisoners but is allowed out to play shuffleboard or catch, hopefully once a week in good weather. As a Death Row prisoner, Jackson is also permitted books from the prison library brought by the prison chaplain on his visits.

Petitioner filed a hand-written complaint against the state prison superintendent under 42 U.S.C. § 1983 on the grounds that the rules and regulations of the prison deprived him of the equal protection of the laws by denying him the right to receive Negro newspapers and magazines because he was a Negro while permitting white inmates to receive white newspapers and magazines. The petition specifically alleged that (1) he was denied a request to subscribe to a Negro newspaper, the *Pittsburgh Courier*, and to national magazines such as *Ebony* and *Sepia*, which are published primarily for Negroes; (2) none of the reading material selected by a special screening committee was designed for Negro readers even though one-half of the prison population was non-white; (3) petitioner was denied a request to subscribe to any Negro newspaper; (4) none of the requested material could be construed as subversive or destructive to the morals of the petitioner and (5) white inmates were free to choose any newspaper they desired so long as it did not fall within one or both of the above-named prohibited categories. The petition contained the prison superintendent's answer to petitioner's request, which answer asserted that only subscriptions to newspapers of a prisoner's hometown were permitted and, as to the requested Negro magazines, white inmates on Death Row were not permitted "to have *Esquire.*"

The petition further alleged that Jackson had received the white-oriented *Washington Post* for three months, the *Tampa Tribune* and *Times* for nine months, the *Gainesville Sun* for four and one-half months and the *St. Petersburg*

*Times,* Sunday issue, for three months, and also averred that the petitioner had received the Negro newspaper, *The Amsterdam News,* a weekly published out of New York City, until prison officials discovered that it was a Negro newspaper. The petition stated that as a result of being forced to read only white newspapers and magazines and being denied access to Negro publications, petitioner as a Negro was kept ignorant and uninformed as to news and events in the Negro community. The petition requested the district court to restrain the prison officials from denying petitioner access to non-subversive Negro publications and that petitioner specifically be permitted to read *Ebony, Sepia* and *Tan* magazines and the *Pittsburgh Courier* newspaper and other non-subversive Negro newspapers.

The prison authorities' defense was that petitioner's rights had not been violated because (1) control of mail was an essential part of the administration and maintenance of prison discipline; (2) administrative power to control the form of reading matter within state institutions for the use of prisoners was clearly set forth by Section 944.11 Fla.Stats., F. S.A., which authorized the adoption of such regulations as the Board of Commissioners of state institutions might deem proper and by Section 945.21(1) (j) which specifically authorized regulation of the mail to and from prisoners; (3) pursuant to the valid statutory authority, rules and regulations controlling the admission of reading material has been adopted, specifically authorizing the prison superintendent to refuse mail if in his opinion, such mail would be detrimental to good order and discipline and granting officials the authority to set up a specific list of reading materials; (4) that the magazines and periodicals which Jackson sought were "of a known character to induce lack of security in the penal system because of their nature to incite and stimulate in an unhealthy manner, and such matters of control have long been recognized to be purely within the administrative discretion of the custodian of any prison."

At a full evidentiary hearing held before the district court to determine the merits of petitioner's allegations, it was developed that the rules and regulations adopted by the prison authorities under authority delegated by Florida law provided a list of magazines to which prisoners were restricted in their subscriptions. This list consisted of the weekly issues of *U. S. News and World Report* and *Sports Illustrated,* the monthly publications of *Reader's Digest, National Geographic,* and *Outdoor Life,* the semimonthly *Saturday Evening Post,* and six issues a year of *Pocket Crossword Puzzles.* The regulations and rules also provided that a prisoner could subscribe to one newspaper of his choice, but that choice was restricted to newspapers published in the prisoner's home town.

Assistant Superintendent Godwin asserted that race had played no part in the regulations and that there was no conscious discrimination in the selection of reading materials but those selected were publications aimed at a "general cross-section of Americans." He stated that the hometown newspaper rule applied to all prisoners and represented a necessary administrative decision to "draw the line" somewhere. Godwin further urged the reasonableness of the regulations and justified them on the basis that strict control was necessary to insure that no publications containing elements of violence or sex entered the prison, for racial tensions and general prison life would make prison discipline extremely difficult if prisoners had access to such materials. He further asserted that the regulations were administrative efforts to cope with the problem of bulk and censorship and maintained that prison officials had "reports of magazines being impregnated with LSD and other types of dope" in other prisons.

The district court denied petitioner relief on the grounds that control of the mail was an important part of the administration and maintenance of discipline and it was not the duty of the federal courts to superintend the general administration of state prisoners, and that the courts would interfere with the

enforcement of rules and regulations only in extreme cases:

"Respondent has affirmatively shown at the hearing that the method for selection of reading materials is not accomplished in an arbitrary or discriminatory manner, but in a systematic way to benefit all those incarcerated in the state prison. The broad scope of magazines and other reading material available to the prisoners has not been shown to be racially directed in any manner. Petitioner has failed in his burden to show that the practices complained of are manifestly discriminatory in violation of 42 U.S.C. § 1983."

We must reverse.

■ It is true that "(L)awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 1948, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356. "It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere." Sewell v. Pegelow, 291 F.2d 196, 197 (Fourth Circuit, 1961). Some deprivations are a necessary and expected result of being an inmate of a penal institution, which institution must provide for the custody, maintenance, discipline and optimistically, rehabilitation of those who have violated the laws of the sovereign.

However, we have come a long way from some earlier attitudes toward the rights of prisoners such as the following: "He [the convicted felon] has, as a consequence of his crime, not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords him. He is for the time being the slave of the State." Ruffin v. Commonwealth, 62 Va. (21 Grath) 790, 792 1871). Prisoners suffer many other kinds of deprivations which are not a necessary result of the institutional structure of prisons but rather are attributa-

ble to arbitrary and capricious decisions by prison officials or to unduly restrictive prison regulations. See Note, 72 Yale Law Journal 506 (1963) and Note, 110 U.Pa.L.Rev. 985 (1962). There has been the growing recognition that "[a] prisoner retains all the rights of an ordinary citizen except those expressly or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (Sixth Circuit, 1944).

■ Acceptance of the fact that incarceration, because of inherent administrative problems, may necessitate the withdrawal of many rights and privileges does not preclude recognition by the courts of a duty to protect the prisoner from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court. "[I]t is well established that prisoners do not lose all their constitutional rights and that the Due Process and Equal Protection Clause of the Fourteenth Amendment follow them into prison and protect them there from unconstitutional action on the part of prison authorities carried out under the color of state law. [citing cases]." Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala. 1966), aff'd per curiam 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212.

The Supreme Court has declared invalid such state prison regulations as those requiring a prisoner's legal documents to be approved by officials before they are to be forwarded to the courts in Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034. See also In re Riddle, 57 Cal.2d 848, 22 Cal.Rptr. 472, 372 F.2d 304 (1962). A prisoner is denied equal protection of the laws if officials prevent him from taking a timely appeal. Cochran v. State of Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453; Dowd v. United States, ex rel. Cook, 340 U.S. 206. A state parole board regulation assessing an additional year of incarceration prior to consideration for parole upon any state prisoner who files for writ of habeas corpus which is denied, was held to be a denial of constitutional rights, and the parole board was enjoined from enforcing

this regulation. Smartt v. Avery, 370 F. 2d 788 (Sixth Circuit, 1967). It is impermissible for prison officials and regulations to deny a prisoner access to the courts unless that prisoner has managed to obtain counsel. White v. Ragan, 1945, 324 U.S. 760, 762, 65 S.Ct. 978, 87 L.Ed. 1348 note 1. See also Spires v. Dowd, 271 F.2d 659, 661. (Seventh Circuit, 1959). A prisoner's allegations of beatings and torture have been held to state a claim under the Civil Rights Acts. Siegel v. Ragan, 88 F.Supp. 996, 998 (N.D. Ill.1949); Gordon v. Garrison, 77 F. Supp. 477.

Even more pertinent to petitioner's case are those cases that have recognized that constitutional safeguards are intended to protect the rights of all citizens, including prisoners, especially against official conduct which is arbitrary, particularly in the area of racial discrimination and deprivation of First Amendment freedoms. In recent cases involving Black Muslims, the courts have held that a complaint which alleged infringement of religious freedom and rights presented a claim which the courts would review on the merits. In Sewell v. Pegelow, supra, and Pierce v. La Vallee, 293 F.2d 233 (2 Cir., 1961), federal courts held that a petition alleging discriminatory treatment because of religion stated a cause of action entitling the Black Muslim plaintiffs to relief under the federal Civil Rights Act. Segregation and discrimination merely because of beliefs could not be justified by inherent prison structural and systematic considerations.

In Sewell, the district court had dismissed the complaint on the grounds that it was without jurisdiction to entertain the petition because the matters alleged related to the discipline and conduct of the internal affairs of the prison which were exclusively within the authority of the Executive Department. The complaint had charged that all the Muslims in the institution had been in isolation and deprived of institutional privileges for no reason other than the hostility of the prison officials toward persons of their faith. The complaint further alleged physical deprivations, discrimination as to both the wearing of religious medals and to consultation with religious advisers, and suppression of grievance letters—all privileges accorded the other prisoners. Thus the constitutionally significant questions of interference with the practice of religion, discrimination in the practice of religion, and discrimination on the basis of religion were raised. The Sewell Court declared:

"It is beyond dispute that certain rights and privileges of citizenship are withdrawn from prisoners, but it has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law." (291 F.2d at 198)

The court reversed the order of dismissal and remanded for a hearing on the merits, citing the statement of United States, ex rel. Marcial v. Fay, 247 F.2d 662, 669 (2 Cir., 1957) cert. den., 355 U.S. 915, 78 S.Ct. 342, 2 L.Ed.2d 274, for the proposition, "We must not play fast and loose with basic constitutional rights in the interest of administrative efficiency."

In the Pierce case, involving a similar complaint, the court noted the extraordinary character of a complaint of religious persecution:

"Whatever may be the view with regard to ordinary problems of prison discipline, however, we think that a charge of religious persecution falls in quite a different category. See Marsh v. State of Alabama, 326 U.S. 501, [66 S.Ct. 276, 90 L.Ed. 265] Follett v. Town of McCormick, S. C., 321 U.S. 573, [64 S.Ct. 717, 88 L. Ed. 938] Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, [63 S.Ct. 870, 87 L.Ed. 1292]. As the Supreme Court has there pointed out, freedom of religion and of conscience is one of the fundamental 'preferred' freedoms guaranteed by the Constitution. We must approach decision with that admonition in mind." (293 F.2d at 235).

The court reversed the judgment of the district court and ordered a hearing on the merits.

In Fulwood v. Clemmer, 206 F.Supp. 370 (D.C.1962), the court found that even where the prisoner had committed the offense of proclaiming religiously-derived racist doctrines in an inflammatory setting, the solitary confinement and exclusion of the prisoner for more than two years from the general prison population, the denial of usual recreative and rehabilitative facilities, the denial of the exercise of his religion while allowing such exercise freely to inmates of other religions, and the transfer of the prisoner because of his faith and for the purpose of suppressing and breaking up the Muslim religion in the prison, amounted to punishment not reasonably related to the prisoner's infraction of the prison rule. The court condemned two other deprivations: (1) the denial of chapel facilities to Black Muslims as a violation of the regulations requiring public facilities to be made available to all persons without regard to race or religion and because the prison authorities encouraged and supported the holding of religious services in prison for other denominations, and (2) the confiscation and prohibition of Muslim religious medals as discrimination violating the Commissioner's order prohibiting all discrimination on the basis of race or religion and also because the authorities sanctioned and even supplied such medals to prisoners of other faiths, while confiscating Muslims medals on the grounds they were "symbolic of the Muslim doctrine of hate and tend to create in the prison community race tension and disruptive influences." See also Brown v. McGinnis, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791 (1962).

Two other recent cases give weight to petitioner Jackson's cause. In Washington v. Lee, supra, a three-judge district court struck down racial segregation in Alabama state prisons, declaring that "Since Brown v. Board of Education [of Topeka,] 347 U.S. 483, [74 S.Ct. 686, 98 L.Ed. 875] (1954), and the numerous cases implementing that decision, it is unmistakably clear that racial discrimination by governmental authorities in the use of public facilities cannot be tolerated." 263 F.Supp. 327, 331. The Court stated that it could conceive of no consideration of prison security or discipline which would sustain the constitutionality of state statutes that on their face required complete and permanent segregation.

In Rivers v. Toyster, 360 F.2d 593 (Fourth Circuit, 1966) the district court had dismissed the prisoner's petition for equitable relief without a plenary hearing on the ground that it set forth no justiciable issue because it dealt with the internal administration of the state prison system where the petitioner was lawfully incarcerated. The complaint alleged that the prison superintendent had denied the petitioner the right to receive a non-subversive Negro newspaper, *The Chicago Defender,* because he was a Negro, while permitting white inmates to receive white-oriented newspapers. The Court of Appeals for the Fourth Circuit reversed, holding that the petitioner's constitutional rights had been abridged in the denial to him of his equal protection rights under the Fourteenth Amendment since he was denied a right as a Negro which was being granted to white prisoners. The court stated that the prisoner's right to receive and read nonsubversive newspapers while in state prison was not only specifically granted to him by state law but the alleged discrimination involved a constitutional right which overrode the court's reluctance to interfere with prison administration and discipline: "Nor do we see the case in its present posture as involving a matter of prison discipline.[1] The prison superintendent may not resort to acts of racial discrimination in the administration of the prison." 360 F.2d 593, 594. The court remanded for a hearing on the merits.

1. The complaint does not disclose even a contention by the prison authorities that the denial was an act of punishment for misconduct by the petitioners or that the newspaper involved was subversive.

■■ Thus, it seems clear that in the area of arbitrary official action in the administration of prisons which involves the constitutional rights of inmates to be free from racial discrimination and to enjoy the "preferred" freedoms of the First Amendment courts will not shrink from scrutinizing administrative actions. Additional support for judicial review can be found in the proposition that if a prisoner is serving time to "pay his debts to society," any further restraints or deprivations in excess of that inherent in the sentence and in the normal structure of prison life should be subject to judicial scrutiny. Furthermore, to the extent that prison regulations are designed to teach the prisoners to live in conformity with the norms of society, the sporadic and discretionary enforcement of unreasonable regulations, it appears to us, is more likely to breed contempt of the law than respect for, and obedience to it. Unrestricted, arbitrary and unlawful treatment of prisoners would eventually discourage prisoners from cooperating in their rehabilitation. 72 Yale Law Journal 506, 518–525.

■ Upon careful examination of the record, we find that the prison officials have been arbitrary in the enforcement and application of the newspaper and magazine regulations. We also find that the necessary effect and result of such regulations, even if not arbitrarily, and though even-handedly enforced, is racial discrimination in violation of petitioner's Fourteenth Amendment rights. It is also clear that the prison officials have not met the heavy burden of justifying either the resulting racial discrimination or the resulting curtailment of petitioner's First Amendment freedoms and denial of the equal enjoyment of rights and privileges afforded other, and white, prisoners.

If every benefit of the doubt were given to the assertions of good faith by the officials, in order to find other than conscious racial discrimination, it is apparent that at best the posture of the prison officials in creating and applying the newspaper and magazine rules is one of a study in complete indifference to the interest of one half of the prison population, namely the Negro half. Assistant Superintendent Godwin testified that no attempt was made to include any Negro-oriented publications, nor were any inquiries made of any responsible Negro inmates as to their reading interests:

"Q. Do you happen to recall whether any magazine or periodical or newspaper was permitted which, you might say, was oriented toward the Negro reader?

"A. Really, I don't know as they were even considered on that basis; we didn't even consider that. We just assumed that—"

Godwin testified that the magazine selection committee sought "uplifting," "entertaining and educational" magazines and that they prohibited publications which would "incite and stimulate in an unhealthy manner" because of "sexy or spicy" material or which contained articles concerning racial unrest or violence which would aggravate racial tensions and disciplinary problems in the prison. The prisoners were restricted to a choice of one hometown newspaper because that was a convenient administrative cut-off point and also because the prison authorities felt that hometown news should have the most interest to the prisoners.

Several facts and conclusions are evident from the record. The hometown newspaper rule is not strictly enforced, and this results in white-oriented publications being received in plentiful supply while Negro publications are excluded. For example, there are three white-oriented Florida state-wide newspapers available to prisoners in the prison canteen. Prisoners have been able to subscribe to white newspapers from other than their hometown. In fact, petitioner Jackson testified that he had at different times subscribed to four non-hometown white newspapers for periods ranging from three to nine months. Godwin testified to the effect that short-time subscriptions were permitted but not "prolonged" subscriptions.

Petitioner's assertion that inmates were allowed to receive the Negro newspaper *Amsterdam News* until prison authorities discovered that it was a Negro newspaper went uncontroverted. The operation of the hometown rule was that petitioner Jackson would be allowed to receive the *Pittsburgh Courier's* Florida edition, the *Florida Courier*, provided of course, it met the other guidelines prohibiting sex and violence, only if petitioner were from its hometown of publication, Miami, but because petitioner's hometown was fifty miles away in West Palm Beach, he could not receive it.

The record also shows that the newspapers and magazines *allowed* in the prison carried extensive coverage of riots and other such news-worthy events, even to the point where the district court noted that it would take judicial notice of such coverage.

With such a loosely applied hometown newspaper rule, which results in white-oriented newspapers apparently being in plentiful supply to, and circulation among, the inmates, a strong inference arises of conscious exclusion of Negro-oriented newspapers because they are Negro-oriented, and prevention of Negro prisoners from reading such because they are Negro. Godwin's testimony as to censorship of "spicy or sexy" material or articles of violence and social unrest bears on the inference that can be drawn from Negro-oriented viewpoints are consciously excluded. Godwin maintained that the Negro publications in question contained such prohibited material, but it is apparent that the same material in a white-oriented publication met with the committee's approval and that Negro publications were the ones that had to meet the tests and were the ones to fail.

Godwin's testimony as to the application of the sex and violence guidelines to the accepted list of publications and to the rejected *Ebony* and *Sepia* is enlightening. The essence of Godwin's objections to sex in the issue of *Sepia* in evidence was a small advertisement and a picture of tribal women, though he asserted the pictures of women in *Saturday Evening Post* were of a more acceptable character. He testified that *Ebony* was objectionable because it contained articles such as that in evidence entitled, "Needed—More Human Communication," which in actual fact deplores the lack of, and calls for more communication between the races and expresses the hope that through such communication racial and social problems will be solved. Godwin maintained that the article showed only "one angle." A *Sepia* issue in evidence contained a story entitled, "Little Rock: Ten Years Later," which declared, "After a decade of painful transformation from bigotry and ignorance, 'city of hate' emerges with dignity and pride," and the article analyzed and praised athletic achievement in the schools as a "big equalizer" in removing racial barriers and promoting racial understanding and harmony. Godwin stated that a companion article entitled "God Is With the Israelis" was objectionable because it showed "violence or something of that nature."

For comparison, a copy of *U.S. News and World Report* on Godwin's approved list was introduced. The first six articles were entitled as follows: (1) "Looting, Burning—Now Guerrilla War"; (2) "Anarchy Growing Threat to Big Cities —Tolerance for Rioters in Question"; (3) "What 'Black Power' Leaders are Demanding"; (4) "Black Militants Talk of Guns and Guerrillas" (with pictures of and the extensive quotes from two generally recognized militant leaders); (5) "A Speech That Touched a Tender Nerve in Congress—a House Member's Analysis of Recent Riots" (Rep. Thomas G. Abernathy, Democrat of Mississippi, denouncing the federal government and the two major political parties and their leaders for "bidding" for the black vote and blaming the riots on such); (6) "Not All This Country Is Tense, Troubled" (survey of places where things are "right" with America, free of tension and turmoil, where "women and children don't have to worry about walking along streets" and which are "populated by upstanding, lawabiding people who look

with astonishment at what is happening in many major cities and wonder at the tendency of high officials to stir up the least stable elements of the population." Three other major articles are entitled, "LBJ's Ideas on How to Stop Riots in Cities," "Riots and Politics: Meaning for 68," and "What to Do About Crime in U. S." The full page editorial of the publisher David Lawrence, another major feature, deplored the "refusal" to use governmental power to "stop the wave of mobocracy." In addition to two articles on the defense line in the Pacific and the Arab-Israeli War, the remaining five major articles dealt with business news. Of course, action pictures of racial unrest and persons involved filled the pages of this magazine.

In opposition to Godwin's evaluation of the quality of *Ebony, Sepia* and the *Pittsburgh Courier*, a publisher and two librarians testified that these publications were oriented to the Negro reader, were educational and informative, that instead of inciting riots or advocating disorder *Ebony* "shows some of the better things that Negroes can be proud of— some of their activities, other than you would see in, particularly, the white press." These witnesses further testified that these publications were among the best Negro publications in the country, were comparable in terms of quality to *Life* Magazine, except they reported the accomplishments of Negroes and items of special interest to Negroes, which articles were not available to white-oriented magazines. They asserted that these publications were available at Jacksonville, Florida public libraries. Jackson himself testified that he wanted to read these publications because they contained articles which could not be found in the white publications allowed in prison and that his West Palm Beach hometown newspaper never carried any news about Negoes except when they were arrested or there was a riot, and that he had been able to obtain copies of white Washington, Atlanta, and Florida newspapers until he filed his petition,

when their receipt was then terminated by prison officials.

There is some penetrating truth to the statement found in petitioner's brief that as to the requested Negro publications, "the prevailing ethic is that only through hard work and political organization have Negroes been able to make progress * * *. In short, the only thing which distinguishes *Ebony* and *Sepia* from approved publications is that they are written about Negroes, with a point of view aimed at a Negro audience."

Over and above the compelling inference of racial discrimination and censorship on a racial basis, it is clear that because Negro newspapers are comparatively rare and are limited mainly to a few major cities, and because we must recognize the "existing dominant social patterns," United States v. Logue, 344 F.2d 290, 292 (5 Cir., 1965) and the "reality of * * * the segregated world," Brooks v. Beto, 366 F.2d 1, 12 (5th Cir., 1966), United States v. Jefferson Board of Education, 372 F.2d 836, aff'd en banc 380 F.2d 385 (5th Cir., 1967), cert. den. sub nom. Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, the hometown rule "inevitably imposes a greater burden on Negroes than whites under existing dominant social patterns," and for this reason, it is "inherently discriminatory as applied." United States v. Logue, supra, 344 F.2d at 292.

Normally the discretion allowed the judgment of state officials is wide and courts will not interfere absent a finding that the governmental action is arbitrary or unreasonable, but where racial classifications are involved, the Equal Protection and Due Process Clauses of the Fourteenth Amendment command a more stringent standard. This has again been made clear by the United States Supreme Court in McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222, which involved the constitutional validity of a Florida statute which singled out for criminal punishment the cohabitation of a Negro and white per-

son of opposite sexes. The Supreme Court found that there was no overriding statutory purpose requiring the proscription of the specified conduct when engaged in by a white person and a Negro, but not otherwise; without such justification, the racial classification was invidiously discriminatory in violation of the Equal Protection Clause:

"Normally, the widest discretion is allowed the legislative judgment in determining whether to attack some, rather than all, of the manifestations of evil aimed at; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious. See e. g. McGowan v. Maryland, 366 U.S. 420, 425–426, [81 S.Ct. 1101, 6 L.Ed.2d 393,] (citing other cases). But we deal here with a classification based upon the race of the participants which must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States. This strong policy renders racial classifications 'constitutionally suspect,' Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884;] and subject to the 'most rigid scrutiny.' Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194, and "in most circumstances irrelevant" to any constitutionally acceptable legislative purpose, Hirabayashi v. United States, 320 U.S. 81, 100, [65 S.Ct. 1375, 87 L.Ed. 1774]. Thus it is that racial classifications have been held invalid in a variety of contexts. See, e. g., Tancil v. Woolls [Virginia Board of Elections v. Hamm], 319 U.S. 19, [85 S.Ct. 157] (designation of race in voting and property records); Anderson v. Martin, 375 U.S. 399 [84 S.Ct. 454, 11 L.Ed.2d 430] (designation of race in voting and property records); Anderson v. Martin, 375 U.S. 399, [84 S.Ct. 454, 11 L.Ed.2d 430] (designation of race on nomination papers and ballots); Watson v. City of Memphis, 373 U.S. 526, [83 S.Ct. 1314, 10 L.Ed.2d 529] (segregation in public parks and playgrounds); Brown v. Board of Education, 349 U.S. 294, [75 S.Ct. 753, 99 L.Ed. 1083] (segregation in public schools)." (At 191, 192, 85 S.Ct. at 288.)

This strict standard has not been restricted to cases involving racial classification by statute. In Lombard v. State of Louisiana, 1963, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338, a criminal conviction arising out of attempts to receive service at public lunch counters was ruled invalid as a product of police enforcement of local custom. Johnson v. Virginia, 1963, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195, struck down the practices of segregating spectators by race in the state courtrooms.

Nor has the state been able to justify racial classifications on the basis that they were the product of discretionary administrative determinations made in good faith without intent to circumvent the Equal Protection Clause. See United States v. Jefferson, supra. In Chambers v. Hendersonville City Board of Education, 364 F.2d 189, (4th Cir. 1966), the court held that the "professional judgment" of the administrators did not justify or overcome the discriminatory racial classification shown on the record of applying different and more stringent standards to the rehiring of Negro teachers than to white teachers while desegregating and integrating the formerly segregated schools and faculties. See also Johnson v. Branch, 364 F.2d 177 (4th Cir., 1966), where the court held that the school board's refusal to renew the contract of a highly qualified Negro teacher was because of her political involvement in the civil rights movement rather than because of infractions of regulations.

Even more pertinent are the cases which have struck down rules and regulations which on their face appear to be non-discriminatory but which in practice and effect, if not purposeful design, impose a heavy burden on Ne-

groes and not on whites, and operate in a racially discriminatory manner. In Meredith v. Fair, 298 F.2d 696 (5th Cir., 1962), this court held that the University of Mississippi's requirement that each candidate for admission furnish alumni certificates of recommendation was a denial of equal protection in its application to Negro candidates, for it was a heavy burden on qualified Negro students because of their race while it imposed no such burden on qualified white students. We stated:

> "The fact that there are no Negro alumni of the University of Mississippi, the manifest unlikelihood of there being more than a handful of alumni, if any, who would recommend a Negro for the University, the traditional society barriers making it unlikely, if not impossible, for a Negro to approach alumni with a request for such a recommendation, the possibility of reprisals if alumni should recommend a Negro for admission, are barriers only to qualified Negro applicants. It is significant that the University of Mississippi adopted the requirement a few months after Brown v. Board of Education was decided." (At 702)

In Ludley v. Board of Supervisors Louisiana State University, 150 F.Supp. 900 (E.D.La.), aff'd 252 F.2d 378 (5th Cir.) 1958, cert. den. 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61, a statute was invalidated which required for admission to state universities a certificate of good moral character addressed to the particular university by the principal of the high school from which the applicant was graduated. Negro high schools were furnished certificates addressed only to Negro colleges and this court held that the purpose and effect of the statute was to discriminate against Negroes. In Hunt v. Arnold, 172 F.Supp. 847, 849 (N.D.Ga.1959) (not appealed), the court held that an alumni certificate requirement of the University of Georgia adopted in 1953 was an unconstitutional burden on Negroes, stating:

> "The Court takes judicial notice of the fact that it is not customary for Ne-

groes and whites to mix socially or to attend the same public or private educational institutions in the State of Georgia and that by reason of this presently existing social pattern the opportunities for the average Negro to become personally acquainted with the average white person, and particularly with the alumni of a white educational institution, are necessarily limited."

Other pertinent cases are United States v. Logue, supra, holding that the requirement that an applicant, as a prerequisite to registration for voting, produce an already registered voter to "vouch" for him was inherently discriminatory as applied in a county in which 70% of the population was Negro but in which there were no Negro voters registered. This court noted that the existing dominant segregated social pattern imposed a heavier burden on Negroes than whites, especially since there were no Negro voters on the rolls and who could thus serve as a supporting witness and thus the Negro applicant had to obtain his "voucher" from the ranks of the white population. In Franklin v. Parker, 223 F.Supp. 724 (M.D.Ala.1963), aff'd per curiam as modified, 331 F.2d 841 (5th Cir., 1964), a requirement for admission to state graduate schools that the applicant have graduated from an accredited college was found to discriminate against Negroes as the State of Alabama had allowed the accreditation of its Negro colleges to lapse and operated only unaccredited Negro colleges.

This court in United States v. Palmer, 356 F.2d 951 (1966), ordered the voting registration offices not to be closed where a disproportionate number of Negroes remained unregistered as a result of past discriminatory practices. Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709, 1954-1955, ordered voter registration requirements "frozen" in order to obviate the effect of prior discriminatory application. Smith v. Board of Education of Morrilton School District No. 32, 365 F.2d 770, (5th Cir., 1965) held that the school board's estab-

lished policy of dismissing teaching staffs of a closed school when other openings were not available at the time of closing could not be applied to Negro teachers of an all-Negro school which was closed in a desegregation plan, where the effect was to impose, without some concern for qualifications to teach, the heavy burden of unemployment solely on those whose constitutional rights had been violated and where the additional result might be to impede the meaningful realization of the constitutional rights of the pupils, even though the policy was non-discriminatory on its face and based on otherwise rational considerations. In Hawkins v. North Carolina Dental Society, 355 F.2d 718 (4th Cir., 1966), the requirement of endorsement by two members of an all-white quasi-governmental society was invalidated where the qualified Negro applicant's application was not even considered because he could not obtain the endorsement of two of the white members: "Under the circumstances, when the Society's membership was racially exclusive and the recommendation of no Negro acceptable, rigid enforcement of the requirements of endorsement by members of the Society is itself a discrimination because of race. * * * Though use of such a rule in other contexts may be both reasonable and proper, applied to exclude Negroes, when no Negro, whatever his professional qualifications, can expect to receive the endorsement of the white members, it is racially discriminatory." (At 723-724). For the same reasons in Cypress v. Newport News General and Nonsectarian Hospital Ass'n, 375 F.2d 648 (4th Cir., 1967), the method of hospital appointments by approval of a three-fourths majority of the all-white general staff voting by secret ballot was invalidated because it manifestly burdened Negro applicants.

That the hometown newspaper rule manifestly burdens the Negro prisoners is clearly demonstrated on this record. There are only a few Negro newspapers in the entire country and a Negro inmate would have to come from one of the rare cities that publishes and supports a Negro newspaper to have the right to receive one. The prisoners have apparently easy access to white newspapers without the burdens of the hometown rule. Though half the prison population is Negro, the prison authorities have not provided a Negro newspaper to go along with the three white newspapers generally available in the prison canteen. Negro publications apparently are unable to meet the sex and violence standards promulgated by the prison officials, and these prohibitions are not applied with such force and care against white publications but only against Negro publications.

Indeed, the prison officals have failed to meet their heavy burden of justifying the effect of the regulations on the rights of Negro prisoners, particularly their rights to be free from racially-discriminating burdens and unnecessary and arbitrary curtailments of their First Amendments rights. If prisoners are to have the rights and privileges of access to newspapers and magazines, then such rights and privileges cannot be arbitrarily denied or curtailed or given in less quantity or quality to Negro prisoners because of their race or because of the prison officials' fear of the Negro "point of view."

The prison authorities maintained at the hearing that the publications contained materials which would have to be screened out, and that the prison did not have the personnel to do this on a large scale, yet it was conceded that the presently approved white publications do have to be screened and there appears no reason why Negro publications could not be on the approved list and be subjected to the same screening that white publications receive in order to eliminate the articles which prison authorities reasonably find objectionable. Reasonable alternatives do exist which do not burden Negro inmates as to the magazine list and newspaper rule, and which would impose no greater burden on the prison staff than that which they have already

assumed toward handling white publications. Negro inmates could and should be permitted to receive at least one Negro newspaper of their choice, either in addition to, or instead of a hometown white newspaper and prison authorities could and should add to the approved list one or more Negro magazines selected for quality.

 In both the areas of racial classification and discrimination and First Amendment freedoms, we have pointed out that stringent standards are to be applied to governmental restrictions in these areas, and rigid scrutiny must be brought to bear on the justifications for encroachments on such rights. The State must strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement, Bates v. City of Little, 1960, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480; N.A.A.C.P. v. People of State of Alabama, 1958, 357 U.S. 449, 463–465, 78 S.Ct. 1163, 2 L.Ed. 2d 1488; Thornhill v. People of State of Alabama, 1940, 310 U.S. 88, 95–96, 66 S. Ct. 736, 84 L.Ed. 1093; Herndon v. Lowry, 301 U.S. 242, 258, 57 S.Ct. 732, 81 L.Ed. 1066; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234, Note 4; Schneider v. State of New Jersey (Town of) Irvington, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 87 L.Ed. 162; Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430; and in the absence of such compelling justification the state restrictions are impermissible infringements of these fundamental and preferred rights. Talley v. State of California, 1960, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559; Cantwell v. State of Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 906, 84 L.Ed. 1213; Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247; Hague v. C.I.O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

Moreover, in examining the justification for state infringement in the areas of equal protection and First Amendment freedoms, the Supreme Court has recognized and declared the principle that the means utilized by the state, as well as the ends, must be legitimate. Even the most legitimate of legislative ends cannot justify the enforcement of fundamental rights of individual citizens if these ends may be accomplished by the use of less restrictive alternative means which result in less invasion of these fundamental rights. As expressed by Justice Stewart in Shelton v. Tucker, supra, 364 U.S. at 488, 81 S.Ct. at 252.

"In a series of decisions [subsequently citing and discussing Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574; Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280; Talley v. California, supra; Schneider, supra; Cantwell, supra. See also Louisiana, ex rel. Gremillion v. N.A.A.C.P., 366 U. S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301; N.A.A.C.P. v. Burton, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405; Aptheker v. Secty. of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992] this court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose."

This same basic formula was recently applied by the Supreme Court to legislative criminal sanctions against draft-card destruction in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, (May 28, 1968):

"To characterize the quality of the governmental interest which must appear, this Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. [Footnotes

omitted.] Whatever imprecision inheres to these terms, we think it is clear that a governmental regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; *if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.*" (At 4472) (Emphasis added.)

On the facts of petitioner's case we find both governmental power and governmental interest in maintaining prison discipline through appropriate rules and regulations, but we find that the governmental interest and application of the regulations here are *not* unrelated either to the suppression of First Amendment freedoms or to racial discrimination, either designed or in practical effect and result, and neither do we find that the restrictions inherent in these regulations and in their application on First Amendment and equal protection rights to be no greater than that which is essential to furtherance of the state's interest in order and discipline.

### AS TO FUTURE PROCEEDINGS IN THIS CASE.

(1) This Court finds it necessary to remand this case to the District Court for the purpose of making specific findings of fact as required by Federal Rule of Civil Procedure 52(a) which requires that

" * * * [I]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon * *. The purpose of this rule 'is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court.' * * * Findings of fact must be made in sufficient detail and exact-

ness to indicate the factual basis for the ultimate conclusion reached by the court." See Silberblatt, Inc. v. United States (5 Cir. 1965) 353 F.2d 545.

To make certain findings listed below it will no doubt be necessary for the trial judge to hear additional evidence. Included in such findings are the following:

(a) The prison rules adopted by the Board of Commissioners of State Institutions pursuant to Florida statutes are in the Record. There is a rule concerning mailing privileges which leaves the censoring of the same to "a designated employee of the institution." The superintendent of an institution is one of those having the right to pass on the mail and, in the instant case, defendant Godwin, Assistant Superintendent, is named as defendant.

However, as to reading material Rule 190A–3.046 includes the following:

"The Director is granted authority by the Board to set up a specific listing of reading material, books and literature which may be admissible in the correctional institutions in the State of Florida.

"The Director is authorized to prescribe the above listing by executive order and to amend such listing when necessary."

We assume the Director means the Director of Prisons having control of all the correctional institutions in the state, but he is not made a party in the instant case, and the District Judge should determine whether he is a necessary party for purpose of allowing the plaintiff in the court below, and others in the class which he represents, to be permitted to subscribe to the magazines, *Ebony* and *Sepia*.

(b) There is much evidence in the Record indicating that the magazines *Ebony* and *Sepia*, edited by Negroes, are not subject to criticism and stand on a parity with the magazines published by whites and permitted by the Director.[2]

---

2. According to testimony by a librarian in Jacksonville those magazines are proper, the witness testifying "I consider Ebony one of the very best magazines that's

(c) We consider that the effect of our final judgment in this case will be of far reaching consequences, to both the federal system of prisons and to state systems, particularly in the Fifth Judicial Circuit. We find considerable doubt from the Record as to what class of prisoners is sought to be benefitted by this action. It may be the approximately one-half of the prison population of thirty-two hundred, that is some sixteen hundred; it may be the prison population in the East Wing consisting of some eleven hundred; it may be only the prisoners in the East Wing on Death Row, consisting of approximately thirty-six Negroes and fourteen whites. No mention is made of other prisoners desiring the magazines in question except as to two others, and they are not witnesses.

This Court takes judicial cognizance of the fact that prison officials in many of the large institutions in this country are met with the problem as to selecting television programs, radio programs, chaplains, literature, and other matters so as to be proportionately fair to at least the larger racial and ethnic groups in the institution. We also take cognizance of the fact that the Record in most of such cases discloses the number of prisoners in each group, and their desires. Our ultimate decision in this case, therefore, should be to pass upon findings of fact and a judgment by the trial judge with those considerations in mind. It is easy to visualize the intolerable burden which would be based upon our federal system to be forced to adjudicate the rights of each individual prisoner, state and federal, to subscribe to each and every magazine or newspaper desired. Discrimination in any particular institution, however, as to any particular group is not so difficult.

(d) The trial judge should make findings of fact concerning the contentions by respondent as to the burden allegedly placed on respondent of examining and censoring the newspapers and magazines, and examining the bulky packages to ascertain whether they contain narcotics and other matters. That issue, however, would pertain primarily to the total number of magazines and papers allowed, but has no reference to the matter of discrimination.

(2) As petitioner through this extensive litigation has been delayed in obtaining any relief until now, we are directing the trial judge to enter an order which shall stand until further procedures herein outlined have been completed, and a final judgment rendered as follows:

The judgment below is reversed and the cause remanded to the district court for proceedings not inconsistent with this opinion and for the entry of an order (1) restraining prison authorities from unequal and arbitrary application of rules and regulations to petitioner Jackson and other Negro prisoners and restraining prison authorities from denying to petitioner and other Negro prisoners the rights and privileges afforded white prisoners as to access to "nonsubversive"[3] newspapers and magazines; (2) restraining prison authorities from denying petitioner and other Negro inmates the full and equal protection of the laws, free from racial discrimination, and the fullest enjoyment, within normal prison order, and equal enjoyment of First Amendment rights, free from arbitrary censorship and suppression; and as a minimum, until further order, (3) directing prison authorities to modify the hometown newspaper rule so as to allow petitioner and other Negro prisoners access to at least one non-subversive Negro

published, and its on the same level with Life Magazine." The copy of *Ebony* and *Sepia* in the Record is very bulky, and it is the function of the trial judge and not this court, to make findings as to the conflicts in the evidence concerning the nature of their contents.

3. The use of this term does not invite a loose determination that such a newspaper or magazine is "subversive" certainly not unless, upon identical standards "white" publications are subject to this same determination.

newspaper of their choice; and (4) directing prison authorities to add at least one non-subversive Negro magazine of reasonable quality to the approved list of magazines. Remanded.

HOOPER, District Judge (concurring).

I thoroughly concur in the disposition made of this case as shown in the above opinion. Until the District Court, however, makes more complete findings of fact, I can not agree with all of the inferences made in the above opinion as to intentional discrimination. I am advised by the Administrative Office that "of the 1088 prisoner cases reported during the first half of the fiscal year 1967, there were 515 that were based on alleged violations of civil rights," and that "the growth in the number of these cases in the last few years has been phenomenal." The situation calls for careful consideration upon the part of both prison officials and judges.