Henry E. WALKER et al., Appellants,

v.

Olin G. BLACKWELL, Warden, United States Penitentiary, Atlanta, Georgia, Appellee.

No. 26079.

United States Court of Appeals
Fifth Circuit.

May 14, 1969.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., for appellants.

Charles L. Goodson, U. S. Atty., Theodore E. Smith, Asst. U. S. Atty., Atlanta, Ga., for appellee.

Before BELL and COLEMAN, Circuit Judges, and HENDERSON, District Judge.

ALBERT J. HENDERSON, Jr., District Judge:

Appellants (hereinafter referred to as petitioners), Black Muslim prisoners in the Atlanta Federal Penitentiary, claim that they are entitled, under the First and Fifth Amendments, to certain religious practices denied them by the warden. The district court held that the warden's denial of these privileges was reasonable, unarbitrary, and, therefore, within his constitutional limits of discretion. We affirm in part and reverse in part.

Petitioners are before this court for the second time. On their first appearance, the judgment of the district court, which dismissed their petition as not actionable under the Civil Rights Act of 1871, 42 U.S.C. § 1983, was reversed. We held that the petition stated a cause of action as a civil action in the nature of mandamus, under 28 U.S.C. § 1361, and remanded for a determination on the merits. Walker v. Blackwell, 360 F.2d 66 (5th Cir. 1966). The petitioners now appeal the judgment by the trial court against them on the merits.

During the course of the litigation in this case, petitioners have won the right, both by compromise and court order, to various religious practices, including (1) wearing of religious medals, (2) the possession of the Black Muslim bible, the Holy Qur-An, (3) to hold weekly scheduled religious meetings, (4) the possession of the book, Message to the Black Man, by Elijah Muhammad, (5) to apply for a chaplain to be reimbursed by the government on a contract basis. Here, they seek the following privileges, all of which were denied them by the district court: (1) to be served a specified restricted diet after sunset, during the month of December (Ramadan), (2) to listen to the national weekly radio broadcast of their prophet, Elijah Muhammad, (3) to receive the Black Muslim newspaper, "Muhammad Speaks", (4) to correspond directly with Elijah Muhammad.

We stated the issue in the earlier case of Walker v. Blackwell: "* * * [Whether] the rules and regulations imposed on these prisoners are reasonable and justifiable in the administration of a large prison population, maintenance of discipline, and control of any dangers and hazards presented." 360 F.2d at 69.

■ There is no doubt that the courts will scrutinize administrative action involving the constitutional claims of prisoners, Black Muslim or otherwise, who allege racial or religious discrimination, or claim a deprivation of the "preferred" freedoms of the First Amendment. *See,* *e. g.,* Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968); Long v. Parker, 390 F.2d 816 (3d Cir. 1968); Toles v. Katzenbach, 385 F.2d 107 (9th Cir. 1967); Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967); Walker v. Blackwell, *supra;* Sostre v. McGinnis, 334 F.2d 906 (2d Cir. 1964); Fulwood v. Clemmer, 111 U.S. App.D.C. 184, 295 F.2d 171 (1961); Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961); Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961).

All that remains for this court is to apply the standard of Jackson v. Godwin, *supra,* to each religious practice giving rise to a conflict between Black Muslim inmates and the warden of the Atlanta Federal Penitentiary.

In both the areas of racial classification and discrimination and First Amendment freedoms, we have pointed out that stringent standards are to be applied to governmental restrictions in these areas, and rigid scrutiny must be brought to bear on the justifications for encroachments on such rights. The [government] must strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement, (citing numerous cases) and in the absence of such compelling justification

the [government] restrictions are impermissible infringments of these fundamental and preferred rights. (Citing numerous cases). 400 F.2d at 541.[1]

■ In other words, the petitioners must first demonstrate to the trial court the deprivation of a right either by (1) deliberate discrimination, or by (2) even handed application of an inherently discriminatory rule. 400 F.2d at 537–540. Then, in order to continue such a policy of deprivation, the government must show a compelling and substantial public interest requiring the subjugation of the right.

At the trial held in the district court, petitioners called four witnesses: Food Supervisor Fred Cameron, and three Black Muslim inmates, Roland X. Ghee, William C. X. Rindgo, George 6X Edward Nixon. Petitioners also cross-examined extensively the government's sole witness, Associate Warden Frederic R. Dickson, Jr. These five witnesses, plus certain documentary evidence, constituted the total evidence before the district court. Based upon this record, we consider the four requested privileges individually.

## I.

### THE AFTER SUNSET MEALS

■ Petitioners testified that it was impossible to make a selection of foods, consistent with their religious beliefs, from the regular daily menu at the penitentiary. The menu was deficient because of the presence of pork, or the essence of swine, which was "divinely prohibited" and could not be eaten by them. Their proposal was to observe Ramadan between 6:00 and 9:00 in the evenings, after the normal dinnertime, but at a time when it would not cause interference with petitioners' regular work schedule at the prison. According to petitioners, the cost of purchasing the foods necessary to their special diet, such as Akbar coffee and pastries, and preparing them for the late meal, would not be prohibitive.

According to Associate Warden Dickson, the prison officials did not feel that they could afford, within the limits of the existing budget, to buy the various items, not already in stock at the penitentiary, which were required by the restricted diet of the Muslims. Of course, some of the items were already in stock. One meal a year, the Passover Seder, was provided for Jewish inmates as a religious holiday meal. However, the Muslims were demanding thirty days of such meals. Because of the additional burden of preparation of these meals, another food supervisor and another cook would be required, creating an additional expense.

Fred Cameron, Food Administrator of the Atlanta Penitentiary, testified that the Muslim menu would not meet the dietary requirements insisted upon by the Bureau of Prisons. Although the essence of swine was present in some of the food at all penitentiary meals, an inmate could "sustain himself very well with the items that do not contain pork" from the regular daily menu. R, 102.

The after sunset hour also created a security problem:

Well, each of these people in an institution the size of the penitentiary of Atlanta live in different quarters. Many of them live inside of a cell block. Many of them who have reduced custody live outside of the security area, which would require a security problem of bringing these people. R, 78–79.

\*   \*   \*   \*   \*   \*

The movement of people after \* \* \* the sun is down presents a problem because \* \* \* we do not staff for that sort of thing. We'd

---

1. The Third Circuit has stated it this way:
   To justify the prohibition of religious literature, the prison officials must prove that the literature creates a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution. Long v. Parker, 390 F.2d 816, 822 (3d Cir. 1968).

have to re-staff. We have a ceiling placed on us and on staffs so we could not go out and just hire anybody off the street to take care of their program. R, 47.

The district court upheld the warden on all counts. It noted the additional expense of the purchase of additional food to prepare the December (Ramadan) meals, and found that "* * * there is no purposeful discrimination as among the various religious sects in the prison as to diet". With regard to the general allegation that petitioners were subjected to a diet which offended their religious practices, and the testimony that all of the foods furnished petitioner contained pork, except coffee and cereal, the court found that testimony to be untrue and that the diets as shown in the record could sustain prisoners while avoiding pork or the essence of swine. It recognized that the security problem created by the late meal would require "additional staff", because many of the Muslims were severe custodial risks by institutional classification.

We affirm. It is our opinion that considerations of security and administrative expense outweigh whatever constitutional deprivation petitioners may claim. In this regard, the court holds that the government has demonstrated a substantial and compelling interest, that of security, which compels the deprivation of these after-sunset meals during the month of December (Ramadan). In addition, the added expense of purchasing

2. Later, he was asked:
   Q. And on Sunday you have a heavy religious concentration, is that correct?

   A. I don't want you to get the—that it is heavy. It isn't. We have more religious programs on Sunday than we do other days, but they are—I don't think any runs over 15 or 20 minutes.
   *       *       *       *       *

   Q. You also have an evening or nightly program, religious program, don't you?
   *       *       *       *       *

and preparing this special food, in the light of the present ability of the Muslims to sustain themselves without eating essence of swine, is another substantial reason for placing these minor restrictions on the practice of the faith of Islam at the penitentiary.

II.

THE BROADCAST

The prison radio system was described as having two channels, each of which played continuously from 6:00 A.M. until 11:45 P.M., except on Friday and Saturday nights, when the system operated until 1:30 A.M.

It was prison policy to present a balanced program during the broadcast period. When asked his understanding of the balanced program, Dickson stated:
   A. News programs that are interjected throughout the day, music of different types, and a fairly heavy sports-type program because of the nature of our place.
   *     *     *     *     *     *
   Q. What emphasis, what provision is made to accomodate religious programs?

   A. There is religious programs that are on both of these channels and more so on Sunday since most local or national broadcasting systems are predominently religious. It is particularly in the morning.[2] R, 24–25.

   A. The only evening one that I can see on the schedule they give me shows a Billy Graham program on Sunday at 10:00 to 10:30 and, as I understand it, this hasn't been coming across in the last few months although our schedule shows it. * * * At 10:30 to 11:00 there is an Eternal Light program on NBC on Sunday. That is the evening.
   Q. Now, does the local chaplain, the institutional chaplain, have a program on a daily basis?
   A. Yes; he does. He has a five minute tape * * * at 4:40 P.M. on Channel A. R, 25–26.

The inmates testified that the national broadcast, one-half hour weekly, was the voice of either Elijah Muhammad or one of his leading ministers, and was "directed at the entire world" rather than at a small segment of the population. However, it particularly related to and was inspiring to the Black Muslims.[3] It had been aired in the prison for about seven months, but then had been taken off the air.

Dickson had never heard the broadcast, but testified that he had been told that "the staff members felt that it was an inflammatory hate-type program * * * and it was the decision of the group that this program was not the type that they wanted to be played in the institution." R, 28.

Of the religious programs scheduled, a Billy Graham program was sceduled on Sunday, but hadn't been aired in months. Also on Sunday was the Eternal Light program, but Dickson didn't know if it were directed to the Jewish inmate population. In addition, the Protestant chaplain had a daily five-minute taped religious program.[4]

The district court held:

The respondent warden was justified in refusing to schedule the nationwide broadcast of The Honorable Elijah Muhammad on one of the two inmate listening channels. There being only two such channels for the entire prison population, it did not appear that there were relatively a sufficient number of Muslims to entitle them to one of these channels.[5]

On this issue we affirm the district court, although for different reasons.

First, petitioners failed to demonstrate any denial of equal protection. From the evidence presented, we cannot determine that any religious programming was being directed at other denominations or religions, as opposed to forming a part of the balanced program desired by the warden for the whole prison population. Associate Warden Dickson, for example, did not know if the Eternal Light program was directed to the Jewish inmate population. As to the Billy Graham program, the only testimony adduced was that it, like the Elijah Muhammad broadcast, was no longer being aired. As to other religious programming, there was, again, no evidence that it was being directed at a particular denomination or religion, rather than merely inspirational in character and of interest to the general inmate population.

Further, we find no denial of equal protection, regardless of the five minute

---

3. Roland X. Ghee testified:
   Q. Is the characterization of the broadcast of the Temple of Peace as one being of a political nature a fair one?
   A. Well, I don't agree that it is of a political nature. It is the religious views as expressed by our leader and teacher, The Honorable Elijah Mohammad. In the event that he does say something of a political nature, it is true, yes.
   Q. And your opinion then would be that it is not a fair description of his broadcast?
   A. No, sir.
   Q. During the period that you were allowed to listen to the broadcast of The Honorable Elijah Mohammad, did you gain or derive from it a sense of religious peace and communication?
   A. Yes, sir. During the course of hearing the different broadcasts— and I would like to just mention here that not at all times does The Honorable Elijah Mohammad himself conduct the broadcasts. In many cases such as a ministers— such as his minister Lonnie Shabazz from Washington, D. C., and another minister from Phoenix, Arizona, conduct the half-hour program and at all times I derive spiritual rest and consolation and inspiration from the broadcast. R,125–26.

4. See Note 2, *supra*.

5. The finding of fact by the district court that there were "somewhere between 45 and 60 Muslims" in the penitentiary was incorrect. R,240–41. In addition to Dickson's estimate of 75 to 80, Roland X. Ghee testified that attendance at Black Muslim Sunday services had ranged from 72 to 110, with 79 at the Sunday's service preceding the trial. R,33, 150–51.

daily program by the Protestant chaplain. The existence of that program was due to the presence of a Protestant chaplain in the prison, a privilege which petitioners here have not been denied, but have, through counsel declined to accept.[6] Because the opportunity for a chaplain is available, the opportunity for a daily devotional message, by radio or otherwise, is, at least theoretically, available. Therefore, the five-minute daily program presents no equal protection issue.

Finally, petitioners have failed to show that the broadcast was essential to the spiritual well-being of the petitioners, rather than merely a source of " * * * spiritual rest and consolation and inspiration * * * " to them. In this connection, the absence of proof was accentuated by the number of religious practices already available to Black Muslim inmates.

In essence, the petitioners have shown the court no deprivation of a constitutional right. Therefore, we affirm, feeling no need to prolong litigation on this issue by remanding to the district court for further hearing.

### III.

### THE NEWSPAPER

■ Petitioners testified that they were denied access to and possession of the Black Muslim newspaper "Muhammad Speaks". They complained that it was the only paper directed to their faith, and that they read it for news, information and religious purposes.

Dickson testified that he had never seen the newspaper, "Muhammad Speaks" and that he had no opinion of his own as to whether that particular publication was inflammatory or not. The court recognized that a number of issues of the paper had demonstrated the alleged absence of inflammatory matter. In addition, it recognized that the authorities permitted prisoners to subscribe for and receive religious periodicals published by Catholics, Protestants, Salvation Army and others. But it held, ultimately, that "copies of said publication sustain the contention of the warden that they are inflammatory".[7] Therefore, the exclusion of the newspaper was within the discretion of the warden as a reasonable disciplinary measure.

Although this court has examined the same issues of the newspaper which the trial court examined, we have reached a different conclusion. First, taken as a whole, the newspapers are filled with news and editorial comment, a substantial portion of which generally encourages the Black Muslim to improve his material and spiritual condition of life by labor and study. Nowhere, including the supposedly inflammatory portions described by the court below, does there appear any direct incitement to the Black

6. The court had ordered, on January 11, 1968, that
    * * * [P]etitioners' counsel in order to obtain relief for petitioners concerning the employment of a minister, shall within fifteen (15) days hereof file with this Court by amendment such demand * * *.
    Petitioners responded, on January 23, 1968, in pertinent part:
    Plaintiffs respectfully decline to have a minister of the Muslim faith placed upon contract to conduct religious services at the Atlanta Federal Penitentiary.

7. The court mentioned the following four instances which could be considered of an inflammatory nature:
    Exhibit #1 of September 23, 1966, on the front page has a cartoon entitled in part "Integration Means Hell", showing a line of blindfolded Negroes marching into a pit containing white men with clubs, guns and pistols attacking them. In the same issue (at p. 10) is an editorial by Elijah Muhammad referring to the white race as "devils". In petitioners' Exhibit #10 (October 13, 1967) on page nine there is a large cartoon showing a Negro sitting prostrate in a chair under a bright light surrounded by police officers with broken clubs, a hammer and a mall, the Negro showing every indicating [sic] of having been severely beaten. On page 11 there is a cartoon of a Negro prostrate on the sidewalk being severely beaten by police officers with Uncle Sam standing nearby smiling and saying "Listen, they are playing our song. * * * "

Muslims to engage in any physical violence. Therefore, we conclude that the trial court's holding that the copies submitted to the court were inflammatory, was clearly erroneous. Preston v. Curtiss National Bank, 5th Cir., 1969, 410 F.2d 367; United States Fidelity & Guar. Co. v. Ryder Truck Rental, Inc., 405 F.2d 621 (5th Cir. 1969).

For this reason, we reverse the trial court as to the newspaper, "Muhammad Speaks", and remand for an order directing Warden Blackwell to allow its use to the Black Muslim inmates in the same manner that other newspapers are allowed to other inmates.

This is not to say, of course, that the warden cannot invoke security measures to screen out possible messages and contraband from the pages. Further, should the newspaper ever develop a substantially inflammatory effect on prison inmates, it is at the warden's discretion to take action designed to avoid imminent prison violence. See Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala. 1966) aff'd per curiam, sub nom. Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Wilson v. Kelley, 294 F.Supp. 1005, 1009 (N.D.Ga. 1968); Rentfrow v. Carter, 296 F.Supp. 301 (N.D.Ga. Dec. 5, 1968). The order is merely to direct that the warden not arbitrarily deny Black Muslims the right to read this newspaper, within the normal framework of prison rules and regulations, administration and security.

## IV.

### THE CORRESPONDENCE

The Muslims complained that the letters to their prophet, Elijah Muhammad, for spiritual guidance and advice, had been returned to them unmailed. The reason given by Dickson that the Muslims were not allowed to correspond with Elijah Muhammad was that he had served time in a federal institution. Another reason was that the prison officials did not allow Catholics to correspond with the Pope, although he stated that they were allowed to correspond with their local hometown minister. To the best of Dickson's knowledge, no Catholic had applied to correspond with the Pope. Dickson had no personal knowledge of the time or of the fact that Elijah Muhammad had been an inmate in a federal penitentiary but said he had been told that it was in 1942. The court, considering the above reasons, denied the right to correspond with Elijah Muhammad because such a denial was within the warden's reasonable discretion.

On this issue, we must reverse. There was no evidence, but only supposition and rumor, that Elijah Muhammad had ever been a federal prisoner. Even so, rumor had him confined some 25 years before. Moreover, the Bureau of Prisons' correspondence regulations designated a criminal record as only one factor to be considered in approving a correspondent.[8] Finally, the prohibition against Catholics' correspondence with the Pope is of questionable constitutional merit.

Therefore, on this issue we reverse the district court, and remand for an order allowing each Black Muslim so desiring to correspond with Elijah Muhammad, for the limited purpose of seeking spiritual advice.

Affirmed in part; reversed and remanded in part for proceedings consistent herewith.

---

8. D. Correspondents with Criminal Records:

The existence of a criminal record, in and of itself, should not constitute a barrier to proposed correspondence. Consideration should be given to the nature and extent of the criminal record as weighed against the aims to be achieved in permitting such correspondence. This principle is particularly applicable to relatives who may have a record of arrests and convictions. The guiding consideration or criteria for all correspondents should be; is the correspondent genuinely interested in the inmate or just a chance acquaintance; does the correspondent seek to continue a genuine friendship or is the correspondence likely to result in some illegitimate future relationship or be detrimental to the inmate or to the correspondent?