Curtis Eugene **ROWLAND** and Charles Edward **McClelland**, inmates of the Pen Unit of the Nebraska Penal and Correctional Complex, Box 111, Lincoln, Nebraska, Petitioners,

v.

Warden Maurice H. **SIGLER**, Nebraska Penal and Correctional Complex, Box 111, Lincoln, Nebraska, Respondent.

Curtis Eugene **ROWLAND**, inmate, Nebraska Penal and Correctional Complex, Pen Unit, Box 111, Lincoln, Nebraska, Petitioner,

v.

Ronald B. **JONES**, Associate Warden, Nebraska Penal and Correctional Complex, Pen Unit, Box 111, Lincoln, Nebraska, Respondent.

Civ. Nos. 1541 L, 1616 L.

United States District Court, D. Nebraska.

April 21, 1971.

Thomas J. Gorham, Lincoln, Neb., for petitioners.

C. C. Sheldon, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The plaintiff, an inmate of the Nebraska Penal and Correctional Complex, filed two civil rights actions after gaining permission to proceed in forma pauperis. One attorney was appointed to represent him in both actions. A single evidentiary hearing explored the issues of both cases.

The first action, filed on May 27, 1969, results from the prison officials' denial to the plaintiff of possession of a Black Muslim weekly newspaper, *Muhammad Speaks*. The second action, filed on December 2, 1969, arises from the prison officials' refusing the plaintiff possession of a small medallion. Basically, the plaintiff contends that these denials impinge upon his rights of free speech and free exercise of religion, respectively, as guaranteed by the First and Fourteenth Amendments of the Constitution of the United States.

## FINDINGS OF FACT

The plaintiff, pursuant to his 1963 conviction for murder, is serving a life sentence. He has been and remains a serious disciplinary problem with a history of 37 violations of prison rules and regulations, the boldest being participation in the September, 1970, prison insurrection. Some other infractions also have been of a violent nature. The majority of the plaintiff's time since 1963 has been served in the maximum security

unit away from the general prison population.[1]

### A. *The Black Muslim Newspaper*

A subscription to *Muhammad Speaks* was purchased for the plaintiff by his mother in 1969 with instructions that it be delivered by mail to the plaintiff at the Nebraska Penal and Correctional Complex. Not a single copy of the newspaper has been received by the plaintiff, because all incoming copies have been intercepted by prison officials and placed with the plaintiff's other personal effects to which he has no access.

Prisoners' access to and possession of newspapers is governed by a rule of the institution that a prisoner may subscribe to and receive only (1) his hometown newspaper, or (2) a Lincoln, Nebraska, newspaper, or (3) an Omaha, Nebraska, newspaper. Furthermore, the inmate must secure his subscription through the prison hobby department; copies of newspapers ordered through the publisher directly, either by the prisoner or a third person, are withheld from the prisoner. Some variation in this policy is apparent from the fact that *The Watchtower, Christian Science Monitor,* and the *Church of Christ Bulletin,* religiously oriented publications, are received by inmates, but such receipt is permitted only if they are acquired "through appropriate arrangements with the administration" or "appropriate administrative channels."[2]

On the other hand, prisoners may receive any magazine from an approved list of 250 such publications prepared by a national correctional committee and followed by other prisons throughout the country. There is no evidence to indicate what magazines are included on the list, what standards are used to judge the content of magazines before inclusion on the list, or how often the list is updated. About 50 books chosen by the inmates are available to inmates, including those in maximum security, some of which books are directly related to the black race.

*Muhammad Speaks* has no religious significance to the plaintiff, Curtis Eugene Rowland. He is not a Black Muslim, does not subscribe to the religious tenets of the Black Muslims or Islam, and wants the newspaper for general educational purposes. News and articles regarding politics and racial matters are his main interests in the newspaper.

The reasons for denying the plaintiff access to and possession of *Muhammad Speaks* were related by Associate Warden Jones, as follows:

(1) The newspaper is not the plaintiff's hometown newspaper and is neither a Lincoln nor an Omaha newspaper;

(2) The subscription was not obtained through the prison's hobby department;

(3) The newspaper's format in many respects is anti-government and racist; and

(4) It would impede efforts to rehabilitate the plaintiff and would decrease his chances for future assimilation into the general prison population.

Nobody in the prison, whether in the maximum security unit or in the general population, receives *Muhammad Speaks* with knowledge and approval of the administration and the prison would not permit its receipt by any prisoner, whether or not he was a disciplinary problem.

### B. *The Medallion*

For a Christmas gift in 1969 the plaintiff's mother mailed to him a medallion, described as one which is suspended from

---

1. The penal record of the inmate may be relevant to the degree of a court's interposition. Sharp v. Sigler, 408 F.2d 966 (C.A. 8th Cir. 1969). In the instant case, however, no evidence was presented that the denial to Rowland of *Muhammad Speaks* is for the purpose of discipline. He would not receive the newspaper, even if he did not produce disciplinary problems.

2. Stipulations, filing No. 14.

a chain, is designed to be worn around the neck, and carries the image of the late Dr. Martin Luther King on one side and the inscription, "I have a dream," on the other. Prison authorities concluded, after consultation with a prison minister, that the medallion was not religious and did not qualify under the prison's rule then in effect that prisoners could have in their possession medallions which were religious in nature. After the September, 1970, insurrection, a new restriction was added whereby for security reasons all medallions and jewelry, religious or otherwise, were disallowed prisoners confined to disciplinary quarters. Prior to that more stringent rule, some medallions were permitted, but the permission was not arbitrary or discriminatory. Since the promulgation of the stricter rule, some prisoners have worn medals and medallions, but none has done it with the knowledge or sufferance of prison officials. Medallions, particularly those having chains, are weapons which can be used to inflict serious injury on guards, inmates, or the users themselves.

## CONCLUSIONS OF LAW

■ First Amendment rights of speech and religion are fundamental and preferred. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). No state may interfere with them, unless it can show a compelling need for interference. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); N. A. A. C. P. v. People of State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Talley v. State of California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); and Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ Nothing in the Constitution hints that prisoners are not entitled to the full enjoyment of these rights. Through then Judge Blackmun the Court of Appeals for the Eighth Circuit has spoken in Sharp v. Sigler, 408 F.2d 966 (1969) in these words:

"These precepts do not stop short in their application at a prison's doors. Fundamental rights follow the prisoner through the walls which incarcerate him but always with appropriate limitations."

It is obvious, of course, that mere imprisonment physically hinders speech and the exercise of religious acts, and the need of the state to imprison justifies the limitations on speech and religion to the extent that the limitations are unavoidable. The burden is on the state, however, to show a pressing need for imposing any particular restraint sought to be imposed beyond those inherent in the mere fact of imprisonment. See Blount v. Rizzi, 400 U.S. 410, 418, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).

■ In the present case the restraint is upon the receipt of a newspaper, rather than the expression by the prisoner of his own ideas. The threshold question, therefore, is whether the First Amendment, as applicable to the states through the Fourteenth Amendment, affords protection to a person as a passive receiver of ideas generated by another. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) demonstrates that the First Amendment protection extends to both ends of a communication to protect the receiver as well as the initiator of ideas. Mr. Justice Brennan in his concurring opinion in *Lamont* stated:

" * * * I think the right to receive publications is such a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers."

In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) Mr. Justice Douglas, speaking for the court, declared:

" * * * In other words, the State may not, consistently with the spirit

of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (Martin v. City of Struthers, 319 U.S. 141, 143 [63 S.Ct. 862, 863, 87 L.Ed. 1313]) and freedom of inquiry, freedom of thought, and freedom to teach (see Wieman v. Updegraff, 344 U.S. 183, 195 [73 S.Ct. 215, 220, 97 L.Ed. 216])—indeed the freedom of the entire university community. Sweezy v. State of New Hampshire, 354 U.S. 234, 249–250, 261–263 [77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311]; Barenblatt v. United States, 360 U.S. 109, 112 [79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115]; Baggett v. Bullitt, 377 U.S. 360, 369 [84 S.Ct. 1316, 1321, 12 L.Ed.2d 377]. Without those peripheral rights the specific rights would be less secure. * * *"

In Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), Mr. Justice White said:

" * * * It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. * * * It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. * * * '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' * * * It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC."

Most recently, the Supreme Court in Rowan v. Post Office Dept., 397 U.S. 728, 737, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970) in an opinion written by Chief Justice Burger stated:

" * * * Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit; we see no basis for according the printed word or pictures a different or more preferred status because they are sent by mail. * * * "

Implicit in the *Rowan* holding is not only that a receiver of information has a right to receive it; he also has a concomitant right not to receive what he deems objectionable. I conclude, therefore, that the First Amendment does protect a receiver of other's ideas, as well as one who expresses ideas.

Three applicable tests have been enunciated at different times to determine the constitutionality of state action in restricting First Amendment rights: (1) the clear and present danger test, Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); (2) the incitement to violence test, Chapinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); and (3) the balancing of competing interests test, Rowan v. Post Office Dept., 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). Most of the federal courts which have dealt directly with limitations on First Amendment rights in prisons have considered the disputed communication in terms of whether it presents a clear and present danger. Walker v. Blackwell, 411 F.2d 23 (C.A. 5th Cir. 1969); Knuckles v. Prasse, 435 F.2d 1255 (C.A. 3rd Cir. 1970); and Palmigiano v. Travisono, 317 F.Supp. 776 (U.S. D.C.R.I.1970). Knuckles v. Prasse also employed a balancing of interests test. At least one court has sustained a prison policy of censorship of reading material by finding no abuse of discretion in the implementation of the policy and without applying any of these tests. Cooper v. Pate, 382 F.2d 518 (C.A. 7th Cir. 1967).

## APPLICATION TO
## *MUHAMMAD SPEAKS*

A review of cases specifically dealing with *Muhammad Speaks* reveals a dif-

ference in results. Walker v. Blackwell, 411 F.2d 23 (C.A. 5th Cir. 1969) applied the clear and present danger test, placed the burden of proof on the state, and held that the newspaper was not a clear and present danger, saying:

"Although this court has examined the same issues of the newspaper which the trial court examined, we have reached a different conclusion. First, taken as a whole, the newspapers are filled with news and editorial comment, a substantial portion of which generally encourages the Black Muslim to improve his material and spiritual condition of life by labor and study. Nowhere, including the supposedly inflammatory portions described by the court below, does there appear any direct incitement to the Black Muslims to engage in any physical violence. Therefore, we conclude that the trial court's holding that the copies submitted to the court were inflammatory, was clearly erroneous.

\* \* \*

"For this reason, we reverse the trial court as to the newspaper, 'Muhammad Speaks', and remand for an order directing Warden Blackwell to allow its use to the Black Muslim inmates in the same manner that other newspapers are allowed to other inmates."

Knuckles v. Prasse, 435 F.2d 1255 (C.A. 3rd Cir. 1970) applied the clear and present danger test and the balancing of interests test, did not discuss the issue of burden of proof, and affirmed the district court, saying:

"The [district] court found it was not mandatory that the prison authorities make available Muslim periodicals and books requested by the plaintiffs because these writings 'could be interpreted as an endorsement of a concept that whites generally and prison authorities should be defied by Muslim prisoners even when legal orders or demands are made.' The court explained that 'such a view is not an appropriate interpretation of Black religious Muslim doctrine \* \* \* Since the literature could be subject to inferences urging such defiances if not interpreted by a trained Muslim minister, I rule that it is not mandatory that the prison authorities make available to prisoners the writings.' The court specifically found that 'in the hands of the inmate who is not fully informed of the Black Muslim doctrine \* \* \* the literature could constitute a "clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly function of the institution. \* \* \*" ' "

Cooper v. Pate, 382 F.2d 518 (C.A. 7th Cir. 1967) articulated no test other than one of abuse of discretion, indirectly approved the placing of the burden of proof on the prisoner, and said:

"The district court found that plaintiff had not shown that these publications were basic to his belief or understanding of religion and had not sustained his burden of showing that the censorship was an abuse of discretion. The court dismissed the complaint on this point, and plaintiff appealed.

"This was not the point given principal attention on the trial, and the record is not as clear as it might be. Apparently some of these publications carry articles by Elijah Muhammad and some relate otherwise to matters of faith. Viewed as ordinary reading matter, with only slight relevance to religion, it would be most difficult to establish that exclusion of any such material from a prison is unlawful. Considered as religious material, one question would be whether material of the same degree of religious relevance is permitted prisoners of other faiths. And the extent or tone with which the race doctrine of this particular faith is emphasized would, we think, be a legitimate consideration.

"On the record before us, we cannot say that the finding of the district court was clearly erroneous."

In my view the approach required by a deliberate development of constitution-

al law is that of Walker v. Blackwell, supra. In Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) the court reaffirmed that " 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated * * * is finely drawn [and] * * * separation of legitimate from illegitimate speech calls for * * * sensitive tools. * * * ' Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)."

The "sensitive tools" do not change merely because the context of enforcement is a prison. Upholding of a subjugation of preferred First Amendment rights by deferring to the discretion of the prison warden by means of a "hands-off" doctrine falls short of the duty of a federal court. This does not mean that the circumstances peculiar to prison confinement are irrelevant in applying the First Amendment tests. It does mean that the strict tests should not be abandoned to the less precise rules that were developed to prevent undue intrusion into state penal affairs.

■ A study by this court of the copies of *Muhammad Speaks* in evidence results in a finding that those copies do not contain any direct incitement to physical violence within the meaning of Chapinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) or any other form of clear and present danger within the meaning of Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). In terms of Judge Learned Hand's phrasing, adopted by the Supreme Court in *Dennis*, "the gravity of the 'evil', discounted by its improbability" does not justify the invasion of free speech to avoid the danger in this case.

A balancing of the interests, implemented in Rowan v. Post Office Dept., supra, results in no different conclusion. The reasons pointed to by the state for denial of the newspaper are not of such stature as to overturn a right of free speech. That the newspaper is not the plaintiff's hometown newspaper or an Omaha or Lincoln newspaper is a matter of administrative convenience, perhaps, but certainly is not a virile reason for denial of a First Amendment right. Similarly, the subscription's having been obtained directly by the plaintiff's mother from the publisher is, when tested by the state's burden of proof, of minor significance. The claimed "anti-government" and "racist" orientation of the newspaper is relevant only to the effect which the newspaper might have on the plaintiff or other persons who could read it if the plaintiff received it. Viewed in its entirety, the sum of the evidence is that the plaintiff is and has been a belligerent and uncooperative inmate, but nothing ties his attitudes to his race or his racial views. Only by speculation can it be said that his receiving of *Muhammad Speaks* would promote the attitudes which the prison administration understandably decries. No evidence goes to how other inmates would view the contents of the newspaper. Finally, the administration's thought that the newspaper would impede efforts to rehabilitate the plaintiff and would decrease his chances for future assimilation into the general prison population is subject to the same observations with respect to the claimed "anti-government" and "racist" orientation of the newspaper. I conclude, with deference to the administration's concern for order, security, and rehabilitation, that the state has not carried its burden of proving a factual basis for denying to the plaintiff *Muhammad Speaks* in order to promote a compelling state interest.

I do not rely upon the equal protection clause of the Fourteenth Amendment for this ruling. Jackson v. Godwin, 400 F.2d 529 (C.A. 5th Cir. 1968) relied upon that ground, as well as the First Amendment, in holding that prison officials could not deny access to the *Pittsburgh Courier*, a black-oriented, apparently secular, newspaper, and to *Ebony* and *Sepia*, black-oriented magazines. In Rivers v. Royster, 360 F.2d 592 (C.A. 4th Cir. 1966), the court relied solely upon the equal protection clause of the

Fourteenth Amendment to declare unconstitutional the prison officials' refusal to allow a state prisoner access to *The Chicago Defender,* a black-oriented newspaper. Significantly, when the Supreme Court in N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), was confronted with state action which might have been said to violate either the equal protection clause of the Fourteenth Amendment or the free speech clause of the First Amendment, the court rested its decision solely upon the violation of the First Amendment, holding:

> " * * * (W)e do not reach the considerations of race or racial discrimination which are the predicate of petitioner's challenge to the statute under the Equal Protection Clause. That the petitioner happens to be engaged in activities of expression and association on behalf of the rights of Negro children to equal opportunity is constitutionally irrelevant to the ground of our decision." 371 U.S. at 444, 83 S.Ct. at 344.

A word of admonition is needed. I subscribe to most of the following from Walker v. Blackwell, supra:

> "This is not to say, of course, that the warden cannot invoke security measures to screen out possible messages and contraband from the pages. Further, should the newspaper ever develop a substantially inflammatory effect on prison inmates, it is at the warden's discretion to take action designed to avoid imminent prison violence." 411 F.2d at 29.

## APPLICATION TO THE MEDALLION

■ The prison's policy of total exclusion of jewelry from the prisoners who are in the maximum security unit is directly related to the prison's security. The medallion involved in this action is designed to be worn about the neck and easily could be used as a weapon. In those circumstances, the prison policy, as long as it is enforced non-discriminatorily, does not violate the plaintiff's First Amendment rights. See Cagle v. Ciccone, 308 F.Supp. 1122 (U.S.D.C.W.D.Mo.1969). As in Sharp v. Sigler, 408 F.2d 966 (C.A. 8th Cir. 1969), the plaintiff here has not had his religious freedom drastically curtailed by the warden's action. He has not been denied chapel service, visits by a minister of his faith, or access to religious materials, except as the medallion may have some nominal religious importance to him. Assuming arguendo that the medallion falls within the purview of the First Amendment as symbolic speech, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968), or under the free exercise of religion clause because certain ideas are communicated by the message contained on the medallion, the governmental interest in regulating the non-speech element of the medallion justifies the incidental limitation on the First Amendment freedoms. United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Applying either the clear and present danger test or the balancing of interests test, I conclude that the defendant has met the burden of proof and that the medallion presents an immediate and imminent threat to the security of the institution. Both the means and the ends of the governmental action in this respect are legitimate.

## CONCLUSION

In accordance with the foregoing, an order will be entered granting relief to the plaintiff with respect to *Muhammad Speaks* and denying relief with respect to the medallion.