**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Francis X. KRONCKE and Michael D. Therriault, Defendants-Appellants.**

**Nos. 71–1176, 71–1177.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 19, 1971.

Decided May 3, 1972.

Before LAY, HEANEY and STE-PHENSON, Circuit Judges.

HEANEY, Circuit Judge.

The defendants, Francis X. Kroncke and Michael D. Therriault, were convicted by a jury of wilfully and knowingly attempting to hinder and interfere with the administration of the Military Selective Service Act of 1967 by force, violence, and otherwise.

The evidence showed that the defendants forcibly entered the Selective Service office in Little Falls, Minnesota, at about 11:30 on the night of July 10, 1970. They had with them various tools, including a screw driver, hammer, pry bar, flashlights, a glass cutter, charcoal lighter fluid and other equipment. The defendants were wearing gloves. Once inside, they forced open file drawers and removed some Selective Service draftee registration cards which they placed in a plastic garbage bag. Therriault testified that he and Kroncke intended to either burn the cards or sink them in the Mississippi River.

FBI agents, who had been informed in advance that an entry would be made,[1] observed the defendants enter the building. After waiting approximately fifteen minutes, the agents converged on the draft board office where they found the defendants and observed the opened file drawers, the registration cards in the plastic bag, and the tools. Letters addressed to the news media were found in the car used by the defendants. The letters stated in essence that the Minnesota Conspiracy to Save Lives had destroyed all the I–A draft files for that county.[2]

Kenneth E. Tilsen, St. Paul, Minn., for defendant-appellant Therriault.

Francis X. Kroncke, pro se.

Thorwald H. Anderson, Jr., Asst. U. S. Atty., Minneapolis, Minn., for plaintiff-appellee.

1. The informant issue was specifically raised in United States v. Turchick, 451 F.2d 333 (8th Cir. 1971). See, United States v. Beneke, 449 F.2d 1259 (8th Cir. 1971), another case arising out of this series of draft board raids.

2. The text of the letter is as follows: "Attention all draft age men of Morrison County: We the Minnesota Conspiracy to Save Lives have destroyed all the I–A files for your County. In effect, what we are trying to communicate by our action is: Do you want your life? If you do, then use this opportunity to take control of it. If you don't want your life, then go down to the Morrison County draft board and give it back to the Selective Service System * * * "We invite you to take control of your life and thus become a member of the

The defendants admit that they entered the Little Falls draft board office with the express intent to hinder and interfere with the administration of the Selective Service Act. By way of defense, they claim that their actions were justified.

Kroncke asserted at trial that he was compelled by his religious convictions to perform the act in order to bring the evils of the Vietnam War to the attention of the public and Congress. He stated that this act was necessary because the Vietnamese War is immoral and illegal, and because the political leadership in the United States lacks the moral sensitivity and courage to bring an end to the war. On these bases, and also on the basis that the governmental institutions and political leadership are not responsive to the will of the majority of the people, Kroncke argued that his belief in the necessity of acting as he did was reasonable. He described his act as measured, dramatic, symbolic and religious.

Therriault asserted that he embraced the principles of pacifism and nonvio-lence, and that, because of this, it was necessary for him to cease cooperating with the Selective Service System and to violate its laws. He stated his belief that the United States' participation in the war in Vietnam is illegal and that, by its participation, the United States is breaking international laws, particularly the 1954 Geneva accords. He testified that he believes that if there is not a legal recourse which can bring the war to an end, then people have to resort to nonviolent extra legal efforts based on morality and reason. He stated that his actions were intended to raise a moral challenge which alone possessed the possibility and potentiality of ending the war.

The trial court permitted the defendants to call many witnesses [3] who testified, over the government's objection, on these issues: the damage to Vietnamese society caused by the war; the impact of the war on Cambodia; the extent of civilian casualties in Vietnam and Cambodia; the impact of an act of civil disobedience on bringing the war to an end; the ecological damage to Vietnam;

---

Minnesota Conspiracy to Save Lives. We've done our part to give you back your life. The rest is up to you. "Say NO to DEATH—Say YES to LIFE!"

3. In addition to the defendants appearing on their own behalf, the following defense witnesses appeared:

David Gutknecht: one of the founders of the Twin Cities' Draft Information Center; draft resister and counselor; defendant in Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970).

Gordon S. Neilson: Marine veteran of the Vietnam war.

Robert E. Anderson: Army veteran of the Vietnam war.

Romeyn Taylor: Professor of History, University of Minnesota; specialist in Chinese and Asian history.

Marv Davidow: peace activist.

Arthur H. Westing: Professor of Biology, Windom College, Putney, Vermont; Director, American Academy for the Advancement of Science's study on ecological effects of military uses of herbicides in Vietnam.

Andrew J. Glass: journalist; Congressional correspondent of National Journal, a journal devoted to the coverage of public questions and federal government issues primarily for use as a research tool by other newspapers, government, and corporations.

Daniel Ellsberg: Senior Research Associate, Center for International Studies, Massachusetts Institute of Technology; for 16 years a researcher and consultant to federal government and participant in decision-making on national defense matters.

Staughton Lynd: historian and author; specialization in history of nonviolence, American radicalism, and draft resistance.

Alan Hooper: Professor of Genetics and Cell Biology, University of Minnesota.

Mark L. Jasenko: Director of Religious Education, St. Michael's Parish, Prior Lake, Minnesota; former seminarian.

Alfred Janicke: priest, Catholic radical. William C. Hunt: Director, Newman Center, University of Minnesota; priest; attended Vatican II as official expert in theology; Professor of Theology at St. Paul Seminary.

the extent to which draftees carry the burden of the war; the effect of domestic protests and acts of civil disobedience on the decision-making of high government officials; and the probability that the war will continue unless there is domestic opposition to it. The defendants testified to their moral and religious reasons for committing the acts with which they were charged.

The government made a standing objection to evidence of this nature. The court reserved ruling on the government's motion to strike the testimony at the time it was first made and each time it was made thereafter during the taking of evidence. At the close of the evidence, the government renewed its motion to strike this testimony and to instruct the jury to disregard it. The motion was taken under advisement.

The defendants requested the court to instruct the jury as follows: (1) that if the jury found that the evils sought to be avoided by the defendants were far greater than those sought to be prevented by the law defining the offense and that the defendants acted to avoid those evils upon the belief that their acts were necessary and such belief in the necessity of their acts was reasonable, then the defendants' acts were justified and a verdict of not guilty should be entered; and (2) if the jury found that the evils sought to be avoided and exorcised by the defendants were far greater than those sought to be prevented by the law defining the offense and that the defendants acted to avoid those evils upon the belief that their acts were necessary religious acts, and that such belief in the necessity of their acts was reasonable, then the defendants' acts were justified and protected by the First Amendment of the United States Constitution. The court also took these requests under advisement. It did not rule on the request to strike or, the defendants allege, on the requested instructions prior to oral argument. Neither defendant objected to this failure either before or after closing argument.

Kroncke, acting as his own attorney, joined Therriault's counsel in arguing to the jury the defenses embodied in their instructions. Counsel for the government argued that these acts were not justified.

The court, without further consultation with counsel, instructed the jury as follows:

" * * * [The attempted justification is] based on the theory as to both defendants that the Vietnam war is an evil and the evil sought to be avoided by defendants is greater than the evil sought to be prevented by the law defining the offense; that they believed their acts to be necessary, that their belief was reasonable and therefore they were justified in their actions. * * * In addition, both defendants * * * claim that they were compelled or moved by religious and theological motives and that what they did is characterized in some way as a religious act. * * * [A]ll of what has been received along this line is immaterial. * * *

" * * * I now * * * strike all of the testimony offered by both defendants except for their own personal testimony, and I strike that part which attempts to rely on a justification on account of the Vietnam war or religious oriented reasons. Consequently, all that you have before you for consideration are the facts concerning what occurred at Little Falls, Minnesota on the late evening of July 10, 1970. * * * "

■ The defendants contend on appeal that the trial court erred in refusing to submit the defense of justification to the jury and in failing to advise counsel that he would do so before closing arguments. We reject both contentions.

The defendants cite a number of cases and a tentative draft of Section 3.02 of the Model Penal Code to support their view that the jury should have been permitted to determine whether their acts

were justified.[4] We do not believe that the code or the cases support the defendants' view that the requested instructions should have been given. Two of the cases, United States v. Nye and United States v. Ashton, involved revolts by seamen because they believed that their ships were unseaworthy and their lives endangered. United States v. Holmes involved a case in which a sailor threw passengers out a lifeboat and sought to justify his action on the grounds that it was necessary to save other lives. Commonwealth v. Wheeler and Rex v. Borne involved abortions by doctors who sought to justify their acts on the grounds that the abortions were necessary to protect the health or life of the mother. State v. Jackson involved a case in which a father kept his child out of school to protect her health. In Chesapeake & O. R. Co. v. Commonwealth, a railway company, charged with violating a criminal statute requiring it to maintain separate railway cars for blacks and whites, defended against the charge on the grounds that an unavoidable accident had prevented it from complying on this one occasion. And in State v. Johnson, the court denied the defendant the right to assert the defense of justification to a charge of operating a snowmobile on a trunk highway, on the grounds that the defense of necessity applied only in emergency situations where the peril is instant and overwhelming, and leaves no alternative but the conduct in question.

The common thread running through most of these cases in which the defense of necessity was asserted is that there was a reasonable belief on the part of the defendant that it was necessary for him to act to protect his life or health, or the life or health of others, from a direct and immediate peril. None of the cases even suggests that the defense of necessity would be permitted where the actor's purpose is to effect a change in governmental policies which, according to the actor, may in turn result in a future saving of lives.

The Model Penal Code is broader than the cited cases in that it extends the defense beyond those cases in which the evil to be avoided is death or bodily harm. Nevertheless, the Code does not, in our view, extend the defense to cases in which the relationship between the defendant's act and the "good" to be accomplished is as tenuous and uncertain as here. Furthermore, the Code specifically limits the defense to those situations in which "a legislative purpose to exclude the justification claimed does not otherwise plainly appear." We hesitate to say that Congress did not intend the statute to be applied to those who violated it for the express purpose of challenging our nation's foreign policies.

We turn, then, to the broader contentions on which we believe the defendants truly rely to justify their acts: (1) that the war in Indochina is invalid because it has not been formally declared by Congress;[5] (2) that the Selective Service system is being operated in an unconstitutional manner in that it is used to draft men for the Indochina war; (3) that the war is immoral and unjust, and the defendants were justified in committing the acts they did in order to protest the war and help bring it to an end; and (4) that Kroncke's acts were religious and were protected by the First Amendment to the Constitution.

■ To the extent that the defendants acted as they did to test the constitution-

4. United States v. Nye, 27 F.Cas. 210 (No. 15,906) (C.C.D.Mass.1855) ; United States v. Ashton, 24 F.Cas. 873 (No. 14,470) (C.C.D.Mass.1834) ; United States v. Holmes, 26 F.Cas. 360 (No. 15,383) (C.C. E.D.Pa.1842) ; Commonwealth v. Wheeler, 315 Mass. 394, 53 N.E.2d 4 (1944) ; Rex v. Borne, 1 K.B. 687, 3 All E.R. 615 (1939) ; State v. Jackson, 71 N.H. 552, 53 A. 1021 (1902) ; Chesapeake & O. R.

Co. v. Commonwealth, 119 Ky. 519, 84 S.W. 566 (1905) ; State v. Johnson, 289 Minn. 196, 183 N.W.2d 541 (1971) ; Model Penal Code § 3.02, and Comment (Tent. Draft No. 8, 1958).

5. The defendants also contend that the war in Indochina is invalid because it is in violation of the Geneva accords. We find no proof of this contention in the record and we do not, therefore, consider it.

ality of the war and the draft, they rely in part on the precedent of the early 1960 "sit-ins", used by civil rights workers to test the constitutionality of state and local laws and customs requiring segregation of public eating facilities.[6] As legitimate as this technique may be, those who use it must risk the possibility that their tactics will be found inappropriate or the governmental action valid.[7] The latter is the case here.

■ In Perkins v. Laird, Nos. 71–1491, 71–1380 (8th Cir. unpublished order, September 17, 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972), we rejected the argument that the Indochina war is illegal because undeclared. We stated that we did so for the reasons set forth by the Second Circuit in Orlando v. Laird, 443 F.2d 1039, 1042, cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971):

"* * * [T]he constitutional delegation of the war-declaring power to the Congress contains a discoverable and manageable standard imposing on the Congress a duty of mutual participation in the prosecution of war. Judicial scrutiny of that duty, therefore, is not foreclosed by the political question doctrine. * * * As we see it, the test is whether there is any action by the Congress sufficient to authorize or ratify the military activity in question. The evidentiary materials produced at the hearings in the district court clearly disclose that this test is satisfied.

"The Congress and the Executive have taken mutual and joint action in the prosecution and support of military operations in Southeast Asia from the beginning of those operations. The Tonkin Gulf Resolution, enacted August 10, 1964 (repealed December 31, 1970) was passed at the request of President Johnson and, though occasioned by specific naval incidents in the Gulf of Tonkin, was expressed in broad language which clearly showed the state of mind of the Congress and its intention fully to implement and support the military and naval actions taken by and planned to be taken by the President at that time in Southeast Asia, and as might be required in the future 'to prevent further aggression.' Congress has ratified the executive's initiatives by appropriating billions of dollars to carry out military operations in Southeast Asia and by extending the Military Selective Service Act with full knowledge that persons conscripted under that Act had been, and would continue to be, sent to Vietnam. Moreover, it specifically conscripted manpower to fill 'the substantial induction calls necessitated by the current Vietnam buildup.'" (Citations and footnotes omitted.)

No court decisions have been handed down since *Perkins* to cause us to reconsider the decision we made there. And in United States v. Crocker, 420 F.2d 307 (8th Cir.), cert. denied, 397 U.S. 1011, 90 S.Ct. 1240, 25 L.Ed.2d 424 (1970), we rejected the contention that the Military Selective Service Act of 1967, 50 U.S.C. App. § 451, et seq., is unconstitutional insofar as it functions to draft men for the Indochina war.

■ The defendants rely most heavily on the third and fourth arguments. We turn to their contention that they were legally justified in violating the provisions of the Selective Service Act as a protest to the "immoral" war in Indochina and as a means of bringing that war to an end.

---

6. Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1934); Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961).

7. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Civil Disobedience: A Study of Law and Its Relation to Society, 13 S.Dak.L.Rev. 356 (1968).

This issue was dealt with in United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970), wherein several defendants, including the Berrigan brothers, were convicted of seizing and mutilating draft records. They had attempted to raise a similar defense which the trial court rejected. The Fourth Circuit, in affirming the convictions, stated:

"From the earliest times when man chose to guide his relations with fellow men by allegiance to the rule of law rather than force, he has been faced with the problem how best to deal with the individual in society who through moral conviction concluded that a law with which he was confronted was unjust and therefore must not be followed.[8] Faced with the stark reality of injustice, men of sensitive conscience and great intellect have some-times found only one morally justified path, and that path led them inevitably into conflict with established authority and its laws. Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law." [9]

417 F.2d 1008, 1009.[10]

8. Among the more recent discussions of the dilemma that civil disobedience presents in our society, see, e. g., M. L. King, Jr., Why We Can't Wait (1964); National Commission on the Causes and Prevention of Violence, to Establish Justice, to Insure Domestic Tranquility, Chapter Four, "Civil Disobedience" (1969); E. Rostow, Is Law Dead? (1971); C. Whittaker and W. Coffin, Jr., Law, Order and Civil Disobedience (1967); Allen, Civil Disobedience and the Legal Order, 36 U.Cin. L.Rev. 1, 175 (1967); Black, The Problem of the Compatability of Civil Disobedience with American Institutions of Government, 43 Texas L.Rev. 492 (1965); Cohen, Freeman & Van den Haag, Symposium—Civil Disobedience and the Law, 21 Rutgers L.Rev. 1 (1966); Cowen, The Lawyer's Role in Civil Disobedience, 47 N.Car.L.Rev. 587 (1969); Griswold, Dissent—1968, 42 Tulane L.Rev. 726 (1968); Hermann, Justice and Order: A Preliminary Examination of the Limits of Law, 45 Wash.L.Rev. 335 (1970); Keeton, The Morality of Civil Disobedience, 43 Texas L.Rev. 507 (1965); Rosen, Civil Disobedience and Other Such Techniques: Law Making Through Law Breaking, 37 Geo. Wash.L.Rev. 435 (1969); Smith, Legitimacy of Civil Disobedience as a Legal Concept, 36 Fordham L.Rev. 707 (1968); Civil Disobedience: A Case for Separate Treatment, 14 Wayne L.Rev. 1165 (1968). See also, Weber, Toward a Theory of Civil Disobedience, 13 Cath.Law. 198

(1967), wherein the view is expressed that for an act of civil disobedience to be ethically justified, the act must be a non-violent, open appeal for public support, and that the disobedience must accept the sanction of civil authority as a sign that he is not rebelling. The National Commission on the Causes and Prevention of Violence also subscribes to this view. Compare, J. Finn, Protest: Pacifism & Politics (1967); S. Lynd, Nonviolence in America: A Documentary History (1966); Dworkin, On Not Prosecuting Civil Disobedience in Trials of the Resistance 50 (A New York Review Book 1970); Freeman in Civil Disobedience 2 (Center for the Study of Democratic Institutions 1966); Pech, Radical Disobedience and its Justification in Civil Disobedience 263 (H. Bedau ed. 1969).

9. Those who have reached this conclusion include Socrates, St. Thomas Aquinas, Sir Thomas More, Gandhi, Martin Luther King, Jr., and Bayard Rustin. The Lutheran and Episcopal Churches in America have endorsed civil disobedience, but only if action is nonviolent and the actor is willing to accept the consequences of his action. See, Lutheran Church in America, Statement on Race Relations, July 9, 1964 (adopted by the 1964 convention of the church in Pittsburgh, Pa.); Episcopal Church, Report No. 5 on Christian Social Relations (adopted by the

It follows that the defendants' motivation in this case cannot be accepted as a legal defense or justification. We do not question their sincerity, but we also recognize that society cannot tolerate the means they chose to register their opposition to the war.

We need not decide here in what extreme circumstance, if any, governmental acts may be legally resisted. We confine ourselves to this case and hold only that the law does not permit an attempt to seize and destroy Selective Service records even if this is done as an act of conscience. We make no moral judgment on the defendants' acts. We counsel only that the fabric of our democratic society is fragile, that there are broad opportunities for peaceful and legal dissent, and that the power of the ballot, if used, is great. Peaceful and constant progress under the Constitution remains, in our view, the best hope for a just society.

■ We come, then, to Kroncke's contention that his acts were religious ones committed in response to the continuation of the "illegal and immoral war in Indochina," that these acts were protected by the First Amendment, and that he was entitled to have the jury so instructed.

We do not engage in argument about the theological soundness of Kroncke's religious beliefs; to do so would violate the Free Exercise Clause of the First Amendment. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Furthermore, Kroncke's religious creed and the sincerity of his beliefs are not at issue here. What is involved is Kroncke's right to attempt to destroy Selective Service records. The freedom to act is not absolute. It is

" * * * conditional and relative and Congress may prescribe and enforce certain conditions to control conduct which may be contrary to a person's religious beliefs in the interest of the public welfare and protection of society. * * * "

Leary v. United States, 383 F.2d 851, 859 (5th Cir. 1967), and cases cited therein, rev'd on other grounds, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

Congress has passed the Selective Service Act and has legislated appropriate criminal sanctions for anyone who wilfully attempts to hinder or interfere with its operation. For us to accept "religious practice" as justification for Kroncke's act

" * * * would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

Reynolds v. United States, 98 U.S. 145, 167, 25 L.Ed. 244 (1879).

We recognize that in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed. 2d 965 (1963), the Supreme Court stated that a state may abridge religious practices only upon a demonstration that some compelling state interest outweighs the defendants' interest in religious freedom. And we assume, for sake of this opinion, that the federal government is similarly barred. But, here, the federal government has a compelling interest to protect—the effective operation of the Selective Service system. Furthermore,

1964 General Convention of the Church in St. Louis, Mo.). See also, Greenawalt, A Contextual Approach to Disobedience, 70 Colum.L.Rev. 48 (1970).

10. See also, United States v. Boardman, 419 F.2d 110 (1st Cir. 1969), cert. denied, 397 U.S. 991, 90 S.Ct. 1124, 25 L. Ed.2d 398 (1970) ; United States v. Eberhardt, 417 F.2d 1009 (4th Cir. 1969), cert. denied Berrigan v. United States, 397

U.S. 909, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970) ; United States v. Owens, 415 F. 2d 1308 (6th Cir. 1969), cert. denied, 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 406 (1970). For a discussion of United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970), and United States v. Eberhardt, *supra*, see Civil Disobedience—Protests Beyond the Law, 14 St. Louis U.L.J. 719 (1970).

Kroncke has failed to produce any evidence tending to show that the application to him of the statutory prohibition against interfering with the operation of the Selective Service Act results in a virtual inhibition of the practice of his religion. See, People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813, 818 (1964).

The defendants finally contend that the trial court did not comply with Rule 30, Fed.R.Crim.P., in that it did not inform them of its decision on their requested instructions and on the admissibility of their justification evidence prior to closing argument. The defendants rely upon Wright v. United States, 339 F.2d 578 (9th Cir. 1964), for the proposition that the court's failure to do so requires reversal of these convictions.

The government contends that the trial court did comply with Rule 30 and informed the parties, prior to closing argument, what instructions would be given. The record is too ambiguous to aid in resolving this factual dispute. Nevertheless, for purposes of this opinion, we will assume that the defendants did not know, prior to argument, what instructions would be given.

█ The record does not disclose if the defendants requested a ruling on their proposed instructions prior to closing argument. If they did not, the trial court's failure to rule is not error. Steinberg v. United States, 162 F.2d 120 (5th Cir.), cert. denied, 332 U.S. 808, 68 S.Ct. 108, 92 L.Ed. 386 (1947). If there was a timely request for a ruling, it is clear that failure of the court to make a ruling before closing argument constitutes error. Wright v. United States, *supra.*

Assuming that there was a request for a ruling, we do not believe that the error requires a new trial. At no time did the defendants object to the court's failure to rule on their requested instructions prior to closing argument. Thus, if we are to reverse, we must do so under the plain error rule.

█ We are unable to perceive any way in which the defendants were prejudiced by the error, or any way in which their closing arguments could have been altered. Throughout the trial, the defendants admitted their involvement in the crime and their intention to disrupt the operation of the Selective Service system. On this record, we find no defense which could have been offered other than the defense of justification, which the defendants were permitted to argue fully. On appeal, the defendants have not suggested any way in which the court's error was prejudicial or any way in which their closing arguments might have been changed. Thus, the error was harmless. See, Walker v. United States, 135 U.S.App.D.C. 280, 418 F.2d 1116 (1969).

The convictions are affirmed.