Willie **CLARK** et al., Plaintiffs,

v.

Charles L. **WOLFF**, Jr., Warden, Nebraska Penal and Correctional Complex, Defendant.

Maurice X. **ANDERSON** et al., Plaintiffs,

v.

Charles L. **WOLFF**, Jr., Warden, Nebraska Penal and Correctional Complex, Defendant.

Nos. CV71–L–229, CV71–L–250.

United States District Court, D. Nebraska.

May 24, 1972.

Con M. Keating, Lincoln, Neb., for plaintiffs.

James Duggan, Asst. Atty. Gen., for defendant.

## MEMORANDUM

URBOM, Chief Judge.

Pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and a jurisdictional base of 28 U.S.C. § 1343(3), the plaintiffs, inmates of the Nebraska Penal and Correctional Complex, seek redress of alleged deprivations of their right of free exercise of religion under the First and Fourteenth Amendments to the Constitution of the United States. The two cases raise similar questions and have been consolidated for trial.

The three assertions of impingement upon religious freedom are: (1) denial of receipt of the periodical *Muhammed Speaks* and the books *Message to the Black Man in America* and *How to Eat to Live*, authored by Messenger Elijah Muhammed; (2) denial of visitation by a Black Muslim minister, Mr. Able X. Zackery; and (3) deprival of dietary accommodations.

### I.

■ Perhaps because of and certainly consistent with this court's holding in Rowland v. Sigler, 327 F.Supp. 821 (U.S.D.C.Neb.1971), affirmed 452 F.2d 1005 (C.A. 8th Cir. 1971), the defendant has agreed in open court that the plaintiffs may subscribe to and receive *Muhammed Speaks*. Receiving of the books *Message to the Black Man in*

*America* and *How to Eat to Live* has never been requested of the prison authorities. The plaintiff Clark ordered *Message to the Black Man in America* through his parents and his parents later informed him that they had sent the book but that it had been returned to them by prison personnel. There was no testimony as to why the book was returned. Under such a factual record I can only conclude that the plaintiffs Lewis and Anderson have no controversy with the warden on the issue of the books, because the warden has not been shown to have refused to permit the books to be received by them, and that the plaintiff Clark has provided insufficient facts of a deprivation of his constitutional rights. A warden may invoke reasonable security measures to screen out possible messages or contraband, for example, and there simply are no facts shown in this case to permit me to decide that the warden exceeded his proper discretion regarding the one book. There is no indication that there is or has been a prison policy against permitting *Message to the Black Man in America* or *How to Eat to Live* to be received by inmates.

### II.

■ Although the plaintiffs have alleged that they have been denied opportunity to receive visits from a Black Muslim minister, Able X. Zackery, the defendant has stipulated that Able X. Zackery is on the prison's list of approved ministers and may visit the plaintiffs at any time. No request for visitation has been made. I conclude that there is no controversy on this issue.

### III.

From the evidence the following facts have emerged:

All three plaintiffs are adherents of the Black Muslim faith. As such they subscribe to the teachings of Messenger Elijah Muhammed.

Lewis has been a follower of Muhammed for seven to eight years, which includes a period prior to his incarceration. Clark and Anderson were converted to the faith after their incarceration at the Nebraska Penal and Correctional Complex. As an adjunct to their faith, the plaintiffs observe certain dietary restrictions, the foremost being avoidance of pork, an abstinence founded on the teachings of the Holy Koran. Additionally, the plaintiffs have chosen to follow the teachings of Messenger Elijah Muhammed to the effect that kinds of food have different value and milk is at the summit of the structure. Other foods are assigned values on a descending scale and some are to be avoided at all costs. The plaintiffs Lewis and Anderson have imposed upon themselves a diet consisting solely of milk. Clark follows a diet centered around milk, but also eats other foods such as fresh fruit, some vegetables, and other dairy products.

Since several weeks prior to the hearing, the plaintiffs have been supplied with extra milk. With each of the meals served at the regular meal times, each plaintiff receives two quarts of milk. In addition each is served two quarts of milk at approximately 9:00 p. m. Thus, each plaintiff is supplied with two gallons of milk each day. However, the plaintiffs choose to consume food only between the hours of 4:00 and 6:00 p. m. Lewis, in fact, has imposed upon himself a 72-hour diet; that is, he abstains from all food for 72 hours, then consumes only milk—about seven quarts—between the hours of 4:00 and 6:00 p. m. on the third day. Anderson follows a 48-hour diet, taking only milk—about seven quarts—every second day. It is clear from the testimony of the plaintiffs that this regimen is self-imposed; it is not commanded by any religious stricture contained within the Black Muslim faith. It is, however, based upon the teaching of Messenger Elijah Muhammed

as interpreted by Lewis and Anderson. Although not required by their religious persuasion, they believe that it is helpful to their spiritual and physical well-being.

The testimony of the plaintiffs further showed that the milk supplied them daily has been in excess of the amount they normally consume. On several occasions the milk ration given them at 9:00 p. m. has been poured out. Difficulty has arisen because the plaintiffs wish to have the milk supplied to them only between the hours of 4:00 and 6:00 p. m. In order that they may consume their milk at this time, the plaintiffs have carried milk from the mess hall, an action prohibited by Complex regulations. On at least one occasion this action resulted in a "scuffle" with a prison guard. As a result of that "scuffle" the plaintiffs were convicted of assault. Both Lewis and Clark would no longer be confined in the Complex were it not for the additional sentences imposed as a result of the assault convictions.

It is clear that the defendant has at no time applied any pressure on the plaintiffs to consume foods that are forbidden by the plaintiffs' religious beliefs. To the contrary, the evidence shows that the plaintiffs have been free to a large extent to consume only those foods which they choose to eat.

Complex authorities have not interfered with the plaintiffs' own timetable as to food consumption, although only two quarts of their daily milk ration is given them between 4:00 and 6:00 p. m. The plaintiffs have not been disciplined for their failure to consume food given to them at other times.

■ The issue presented is a very narrow one: Is the failure of the officials of the Nebraska Penal and Correctional Complex to provide milk to the plaintiffs between the hours of 4:00 and 6:00 p. m. only or to permit the plaintiffs to accumulate in their cells milk in sufficient quantities to assure the plain-

tiffs of a supply of approximately seven quarts for consumption between the hours of 4:00 and 6:00 p. m. on such days as the plaintiffs choose violative of the plaintiffs' right to freedom of religion?

The First Amendment of the Constitution, adjusted by the Fourteenth Amendment, states:

"[A state] shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

■ Within the Free Exercise Clause two freedoms are guaranteed—the freedom to believe and the freedom to act. The first is absolute, the second is not. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Here, the only actual restriction on religious acts is that which arises from the prison regulation prohibiting the accumulation of milk in the cells. I am confident that the warden, as a representative of the state, is not compelled by the Constitution to permit that kind of accumulation. To accumulate seven quarts of milk in his cell by 4:00 p. m. on any day under the present prison scheduling, an inmate would have to begin the accumulation by 9:00 p. m. the previous day. Sanitation considerations intercept any temptation to require the officials to allow such an accumulation.

■ To require the officials to alter the food scheduling at the Complex so that each plaintiff could have seven quarts of milk between 4:00 and 6:00 p. m. on such days as each plaintiff chose to have the milk (Lewis, Clark and Anderson have differing individual regimes) would be unwarranted by any constitutional standard. First, the duty of a state is to keep from prohibiting religious acts, not to provide the means for carrying them out. Indeed, a state's providing assistance for religious activities presents grave issues of violations of the Establishment Clause of the First Amendment. State of Illinois ex rel. McCollum v. Board of Education of School District No. 71, 333 U.S. 203, 68 S.Ct.

461, 92 L.Ed. 649 (1948). Second, the practical impossibilities of requiring a penal institution—or perhaps any other segment of society—to be restructured so that a single individual's religious demands would be affirmatively provided for, point up the necessity of interpreting the word "religion" in the Free Exercise Clause as something other than one person's chosen diet, selected as a result of, but not required by his religious faith. I am persuaded that the Nebraska Penal and Correctional Complex is not constitutionally required to make exceptions in its orderly routine to provide for the exercise of dietary practices, where, as here, the evidence shows that those practices are adopted differently by different individuals and differently at different times by the same individual and when the specific practice is not required by a tenet of the organized faith to which the persons belong. See United States v. Kroncke, 459 F.2d 697 (C.A.8th Cir. 1972); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879); Childs v. Pegelow, 321 F.2d 487 (C.A.4th Cir. 1963), cert. denied 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964); and State of Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, 1972.

■■ Claim is made that on one occasion a "scuffle" arose between the plaintiffs and a prison guard, evidently because the plaintiffs insisted upon taking their milk to their cells. For their part in the "scuffle" the plaintiffs were placed in the Adjustment Center for 16 days and thereafter were charged and convicted in a court of law of assault. The plaintiffs now claim here that such placement in the Adjustment Center and subsequent conviction were deprivations of their freedom of religion. I do not agree. Violation of the state criminal laws regarding assault is not justified by a desire for a particular dietary program, even when religiously oriented. See United States v. Kroncke, supra.

Orders will be entered dismissing the actions.